G4IAATAPT                    Bench Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VALENTIN TAPIA, ET AL.,

4                Plaintiffs,

5           v.                           14 CV 8529 (AJN)

6   BLCH THIRD AVENUE LLC,

7                Defendant.

8   ------------------------------x
                                        New York, N.Y.
9                                       April 18, 2016
                                        9:30 a.m.
10
    Before:
11
                        HON. ALISON J. NATHAN,
12
                                        District Judge
13
                            APPEARANCES
14
    MICHAEL FAILLACE & ASSOCIATES, P.C.
15        Attorneys for Plaintiffs
    BY:  RAQUEL A. GUTIERREZ
16  SHAWN R. CLARK

17

18  VISWANATHAN ASIA-PACIFIC INTERNATIONAL LAW PRACTICE GR, PC
          Attorneys for Defendant
    BY:  NADI GANESAN VISWANATHAN
19

20

21

22

23

24

25

G4IAATAPT                        Bench Trial

1              THE COURT:  Good morning.  Please be seated.

2              (Case called)

3              MS. GUTIERREZ:  Raquel Gutierrez, and I'm joined here

4    by Shawn Clark, on behalf of the plaintiffs.

5              Good morning, your Honor.

6              THE COURT:  Good morning to you all.

7              and for the defendants?

8              MR. VISWANATHAN:  Nadi Viswanathan.  I'm here with one

9    of the defendants.

10             Good morning, your Honor.

11             THE COURT:  Good morning to you.

12             We are here today for trial in this civil action and

13   we met last week at the final pretrial conference to discuss

14   procedures and to deal with issues that arose in advance of

15   today.  One issue that I forgot to raise that I'll just ask

16   about now.  The plaintiffs' declarations were translated from

17   Spanish and so I see plaintiff's counsel has an interpreter

18   here today.  Is that correct?

19             MS. GUTIERREZ:  Yes, that's correct. he's sitting in

20   the jury box.

21             THE COURT:  OK.  And let me just ask the interpreter,

22   sir, your name is James Hontoria?

23             THE INTERPRETER:  Yes, your Honor.

24             THE COURT:  What is your native language?

25             THE INTERPRETER:  Spanish.

G4IAATAPT                        Bench Trial

1              THE COURT:  How long have you been translating between

2      Spanish and English?

3              THE INTERPRETER:  I have been a federal interpreter I

4      believe since 2004.  I have been interpreting all my life.

5              THE COURT:  Okay.  Defense counsel have any objections

6      to the qualifications of Mr. Hontoria?

7              MR. VISWANATHAN:  None, your Honor.

8              THE COURT:  Thank you.  I do deem you qualified for

9      interpretation.  And will ask that you raise your right hand

10     and swear or affirm that the interpretation you will provide

11     today will be true and accurate interpretation between Spanish

12     and English.

13             THE INTERPRETER:  Yes, I swear to do so.

14             THE COURT:  Thank you.  You may be seated.  With that

15     issue, are there any other preliminary matters to address?

16             MS. GUTIERREZ:  Yes, your Honor.  Last week before the

17     Court there had not been any joint stipulations of fact.  I

18     just wanted to let your Honor know that actually

19     Mr. Viswanathan and I had a conversation and we are willing to

20     put some stipulations of fact on the record now if you may let

21     me read them into the record.

22             THE COURT:  Any objection?

23             MR. VISWANATHAN:  None, your Honor.  This was the

24     issue I pointed out last time before your kind your Honor that

25     we had on the same day.

G4IAATAPT                        Bench Trial

1            THE COURT:  I'll ask you to pull the microphone up and

2      closer to you and please do keep your voice up.  The acoustics

3      in the room are difficult and then your accent makes it a

4      little bit more difficult to understand.  So given that, I will

5      ask you for everyone, please, speak into the microphone slowly

6      and clearly so that everyone can understand what you are saying

7      and for the benefit of the court reporter.

8            Please say that again, Mr. Viswanathan.

9            MR. VISWANATHAN:  The stipulations which are being put

10     forward of your kind honor today we agreed to on to March 28.

11            THE COURT:  Very well, thank you.  Go ahead.

12            MS. GUTIERREZ:  Thank you, your Honor.

13            Number one, the plaintiff's filed this present action

14     in United States District Court in the Southern District of New

15     York on October 24, 2014.

16            Number two, defendants, BLCH Third Avenue LLC Ajit

17     Bains and Satinder Sharma were timely served with the

18     complaint.

19            Number three, Brick Lane Curry House is an Indian

20     restaurant located at 1664 Third Avenue, New York, New York

21     10128.

22            Number four, BLCH Third Avenue LLC is a domestic

23     corporation organized under the laws of the state of New York

24     and maintains its principle executive office at 1664 Third

25     Avenue, New York, New York 10128.

G4IAATAPT                      Bench Trial

1          Number five, Ajit Bains and Satinder Sharma are

2     shareholders of BLCH Third Avenue LLC.

3          And number six, BLCH Third Avenue LLC had a gross

4     volume of sales and business done of over five hundred thousand

5     per year during the relevant years in this action.

6          THE COURT:  Thank you.  Without objection the

7     stipulated facts are deemed admitted.

8          Thank you.  I appreciate your coming to an agreement

9     at least on some of the pertinent facts.

10         All right.  Any other preliminary matters to address

11    before we call the first witness?

12         MR. VISWANATHAN:  Nothing.

13         MS. GUTIERREZ:  Nothing.

14         THE COURT:  All right.  As we discussed, unless

15    there's any objection to this, I don't see any need for opening

16    statements and I think we can proceed to call our first

17    witness.

18         Ms. Gutierrez.

19         MR. CLARK:  Your Honor, plaintiffs call Mr. Valentine

20    Tapia to the stand.

21         THE COURT:  All right.  Mr. Tapia may come forward.

22     VALENTIN TAPIA,

23        called as a witness by the Plaintiffs,

24        having been duly sworn, testified as follows:

25    DIRECT EXAMINATION

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G4IAATAPT                   Tapia - Direct

1          MR. CLARK:  Your Honor, this is preliminary matter

2     would you prefer that we use the lectern?

3          THE COURT:  I do.  For the witness will you please

4     state your full name.

5          THE WITNESS:  My name is Valentine Tapia.

6          THE COURT:  T-A-P-I-A?

7          THE WITNESS:  Yes.

8          THE COURT:  OK.  All right.  Mr. Tapia, if at any

9     point you have any difficulty with the interpretation, let me

10    know so that we can all be confident that you understand

11    everything as we proceed today.  OK?

12         THE WITNESS:  Yes.

13         THE COURT:  All right.

14    BY MR. CLARK:

15    Q.  Good afternoon, Mr. Tapia.

16         MR. CLARK:  At this time may I approach the witness to

17    present to him what is marked for identification as Plaintiff's

18    Exhibit One?

19         THE COURT:  You may.  This is the declaration of

20    direct testimony?

21         MR. CLARK:  This is the declaration of direct

22    testimony which should be marked in your binder, your Honor, as

23    Tab Four.

24         THE COURT:  I have it and this is an English

25    translation?

1          MR. CLARK:  It is, your Honor.

2          THE COURT:  And do you have the original?

3          MR. CLARK:  That is the original.  The original

4    English declaration was translated into Spanish

5    contemporaneously and then asked to be signed.

6          THE COURT:  Orally.

7          MR. CLARK:  Yes, so there is no Spanish original.

8    Q.  Mr. Tapia, do you recognize the document that I've just

9    handed over to you?

10   A.  Yes.

11   Q.  And is this meant to be a declaration containing your

12   direct testimony in this matter?

13   A.  Yes.

14   Q.  Can you turn to the last page of that document.  Let me

15   know when you're there?

16   A.  Yes.

17   Q.  And is that your signature on the last page of that

18   document?

19   A.  Yes.

20   Q.  And before you signed this document was the document

21   translated to you in Spanish?

22   A.  Yes.

23          MR. CLARK:  At this time, your Honor, plaintiffs would

24   move this into evidence as Plaintiff's Exhibit One.

25          THE COURT:  All right.  Any objections, counsel?

G4IAATAPT                    Tapia - Direct

 1            MR. VISWANATHAN:  No objection, your Honor.

 2            THE COURT:  And let me just confirm, Mr. Tapia, that

 3    you continue to swear to the testimony contained in this

 4    declaration to be admitted into evidence as your direct

 5    testimony.  Do you continue to swear to all statements

 6    contained in this document?

 7            THE WITNESS:  Yes.

 8            THE COURT:  Without objection what's been marked as

 9    Plaintiff's Exhibit One is admitted as the direct testimony of

10    Mr. Valentin Tapia.  Thank you.

11            MR. CLARK:  At this point, your Honor, we would also

12    move into evidence what is Tab Four in the binder, the payroll

13    for the plaintiff, a foundation for which is laid out in the

14    affidavit which has been admitted as Plaintiff's Exhibit One.

15            THE COURT:  Okay.  And will that be marked?

16            MR. CLARK:  Plaintiff's Two.  I do note in the binder

17    that is presented to your Honor the exhibit numbers I believe

18    are out of order from how we're actually presenting the

19    evidence here at trial.  I thought that it would be easier to

20    number the exhibits as they are being admitted in the course of

21    the trial.

22            THE COURT:  It's fine.  I just want to make sure we

23    have clarity.  So could you describe the documents that have

24    been marked now as trial Exhibit 2.

25            MR. CLARK:  Trial Exhibit Two is payroll documents for

G4IAATAPT                     Tapia - Direct

1   the plaintiff Mr. Tapia.  It would be, the title of the sheets

2   is "payroll sheets for front of house".  It is two pages long.

3          THE COURT:  All right.  Two pages long and it's a

4   chart marked 2013 in the upper left corner?

5          MR. CLARK:  Yes, your Honor.

6          THE COURT:  And the name is "Valentino"?

7          MR. CLARK:  Yes, that is the name on the upper right.

8          THE COURT:  All right.  So Mr. Viswanathan, there have

9   not been any objection to what's been marked for plaintiff's

10  Trial Exhibit Two?

11         MR. VISWANATHAN:  No objection.

12         THE COURT:  Exhibit Two is admitted.  Anything

13  further?

14         (Plaintiff's Exhibit TWO received in evidence)

15         MR. CLARK:  No further questions, your Honor.

16         THE COURT:  Thank you.  All right.  Mr. Viswanathan.

17         MR. VISWANATHAN:  May I have a look at Exhibit Two?

18         THE COURT:  Of course.

19         (Pause)

20         THE COURT:  Mr. Viswanathan, you had Exhibit Two IN

21  advance of trial?

22         MR. VISWANATHAN:  Yes.

23         THE COURT:  It was ECF filed I believe, correct?

24         MR. VISWANATHAN:  No, it was not.

25         MS. GUTIERREZ:  It's defendant's production and I

1    believe it was filed the first time around if I didn't turn it

2    over this time around.

3            THE COURT:  I mean I have it.  So unless I believe I

4    got it through ECF.

5            MS. GUTIERREZ:  It's possible the first time around I

6    e-mailed it to prior counsel but it is their production, so

7    they have it.

8            THE COURT:  Mr. Viswanathan, do you have any

9    cross-examination of this witness?

10           MR. VISWANATHAN:  Yes, your Honor.

11           THE COURT:  If you would come to the podium for your

12   cross.

13           MR. VISWANATHAN:  Your Honor, may I have the option of

14   standing at my own please I can do it if I have --

15           THE COURT:  I prefer you at the podium because the

16   acoustics are better but if you need to return to the table to

17   get anything, of course, you can.

18           MR. VISWANATHAN:  Thank you, your Honor.

19   CROSS-EXAMINATION

20           MR. VISWANATHAN:

21   Q.  Good morning, Mr. Tapia.

22   A.  Good morning.

23   Q.  Mr. Tapia, have you ever been before the Southern District

24   before?

25   A.  No.

1   Q.  You never filed any action before the Southern District

2   before; am I correct?

3   A.  Never.

4   Q.  Have you ever filed any action before the Eastern District

5   of New York?

6   A.  No.

7   Q.  Do you realize, Mr. Tapia, that you are standing before the

8   Federal Court of the United States of America and any statement

9   you are making today has to be truthful, correct?

10  A.  That's correct.

11  Q.  If you make any untrue statements first of all, that is

12  going to be a complaint against you that you committed a

13  perjury before a court of law; do you understand that?

14  A.  Yes, I understand.

15  Q.  And there's one more further factor which may act against

16  you.  If you make any wrong statement before this court of law

17  untrue which is subsequently found to be not true it could

18  affect your -- any possible immigration petitions?

19          MR. CLARK:  Objection.

20          THE COURT:  Sustained.  Do you have a question,

21  counsel?

22          MR. VISWANATHAN:  It could affect his --

23          THE COURT:  The objection is sustained.  Do you have a

24  question?

25          MR. VISWANATHAN:  I'm providing --

1          THE COURT:  Move on.

2     Q.  Do you stand by absolutely all the allegations made in the

3     complaint before this court?

4     A.  Yes.

5     Q.  Even at this stage if you think that the allegations in the

6     complaint --

7          THE COURT:  Excuse me.  For clarification, are you

8     asking about his testimony, his trial declaration or are you

9     asking about the complaint?

10         MR. VISWANATHAN:  Complaint.

11         THE COURT:  So you are asking about the legal

12    document?

13         MR. VISWANATHAN:  Yes.

14         THE COURT:  I want to make sure he understands what

15    you are asking.

16    A.  I'm talking about the compliant.

17         THE INTERPRETER:  The interpreter would like to

18    clarify that he pointed to this document.

19         THE COURT:  That was my confusion as well.  So for the

20    witness, the counsel's question is not about the declaration in

21    front of you.

22         MR. VISWANATHAN:  I apologize for the confusion.

23    Q.  Yes.  You have read the complaint you have filed before

24    this Court in this action against BLCH; am I correct?

25         MR. CLARK:  Objection, your Honor.  The complaint is

G4IAATAPT                    Tapia - Cross

1   not in evidence.  I don't think that there's at this point any

2   interest in admitting the complaint into evidence.

3           THE COURT:  Well, I'll allow the question on currently

4   as to whether he's read the complaint that was filed in this

5   action.

6   A.  No.

7   Q.  I didn't understand --

8           THE COURT:  He said, no, he has not read the complaint

9   filed in the action.

10  Q.  So you do not know what other allegations made, what are

11  the allegations made in your name in the complaint?

12  A.  Yes.

13          THE INTERPRETER:  The witness has a question.

14  A.  Could you repeat the question please?

15  Q.  You stated just now that you have not read the complaint;

16  am I correct?

17          MR. CLARK:  Objection.

18          THE COURT:  Overruled.

19  A.  Yes, I read it but again.

20          THE INTERPRETER:  The interpreter would like to point

21  out that he is pointing to this document in front of him.

22          THE COURT:  So I'll ask the witness, please, turnover

23  that document.  And, sir, the question that's being asked is

24  whether you have read the legal document called a complaint

25  that was filed by plaintiff's counsel in this case which

G4IAATAPT                    Tapia - Cross

1   initiated and started this lawsuit.  Have you read that

2   document?

3   A.  Yes.

4           THE COURT:  All right.

5   Q.  When you first meet the defendants?

6   A.  About a year ago.

7   Q.  Is it correct to state that you have never met your

8   attorneys before a year ago?

9   A.  No.

10  Q.  Never?

11  A.  No.

12  Q.  Which particular attorney you have dealt with in the law

13  firm that is presently representing you?

14          MR. CLARK:  Objection; relevance.

15          THE COURT:  What's the relevance, counsel?

16          MR. VISWANATHAN:  I have one point to prove before

17  this Court, your Honor.  It's a very relevant point.

18          THE COURT:  What's the relevance?

19          MR. VISWANATHAN:  The relevance is which particular

20  attorney he talked to in this law firm and I just want to know

21  for the purpose of this case, your Honor.

22          THE COURT:  Sustained.  The objection is sustained.

23  Q.  Mr. Tapia, today, April 18, 2016, you stated now that you

24  met the lawyers one year before today, correct?

25  A.  Yes.

1    Q.  Which means sometime during the year 2015?

2    A.  Yes.

3    Q.  The complaint here was filed in 2014.  How you could have

4    met your lawyers for the first time in 2015 --

5            THE INTERPRETER:  The interpreter needs a repetition

6    of the question.

7            THE COURT:  Counselor, the interpreter asked for a

8    reputation of the question.

9            MR. VISWANATHAN:  I apologize, your Honor.

10   Q.  I didn't see -- I wanted to take your permission -- the

11   complaint, the legal document which the honorable judge just

12   now explained to you was filed before this Court against my

13   clients in the year 2014.  When you say you met with the

14   lawyers for the first time in 2015, how did you file the

15   complaint in 2014?

16   A.  What I know is that the complaint was submitted or

17   presented at the end of 2014 or early in 2015.

18   Q.  And for the record, Mr. Tapia, you never met your lawyers

19   before filing this complaint, correct?

20           MR. CLARK:  Objection.

21           THE COURT:  Grounds?

22           MR. CLARK:  I candidly don't quite understand the

23   question that was asked.

24           MR. VISWANATHAN:  Your Honor, may I respond to it?

25           THE COURT:  You may attempt to rephrase so, yes, I'll

G4IAATAPT                      Tapia - Cross

1   sustain.

2           MR. VISWANATHAN:  The question was very clear, your

3   Honor.  I wanted the witness to confirm that he has never met

4   his lawyer before the filing of this complaint.

5           THE COURT:  Well, presumably, he met the lawyers

6   before the actual filing of the complaint.  What is it that you

7   are asking, right, counsel?  I mean, they presumably spoke to

8   him before the date was filed.  So what specifically are you

9   asking?  Before involvement in case; is that the question?

10          MR. VISWANATHAN:  Yes, your Honor.

11          THE COURT:  All right.  Mr. Tapia, the question is did

12  you meet the lawyers before you met them in the course of your

13  involvement in this lawsuit?

14  A.  I met them before.

15          THE COURT:  When did you meet them?

16          THE WITNESS:  In 2014.

17  BY MR. VISWANATHAN:

18  Q.  What is your job?

19          THE COURT:  Sustained on timeframe grounds.

20  Q.  In general, what is your occupation?

21          MR. CLARK:  Objection.

22          THE COURT:  Sustained.

23  Q.  Since how many years you are in New York City?

24          MR. CLARK:  Objection.

25          THE COURT:  I'll allow it.  I don't know what the

1    relevance is but I'll allow it.  Go ahead.

2    A.  Eight years.

3    Q.  In all this eight years, what were you doing?

4            MR. CLARK:  Objection.

5            THE COURT:  Grounds?

6            MR. CLARK:  I don't think it's even within the scope

7    of the direct in this case and it's also completely ambiguous.

8            THE COURT:  Overruled.

9    A.  Making deliveries.

10   Q.  Are you in the habit of working for sometime with the

11   restaurant and then filing cases against them?

12           THE INTERPRETER:  Again, interpreter needs a

13   repetition of the question.

14   Q.  Are you in the habit of working for sometime with any

15   restaurant and then filing an employment case under the federal

16   law against the restaurant?

17   A.  No.

18   Q.  When did you start working for the different restaurant

19   BLCH Brick Lane Curry House?

20           THE INTERPRETER:  Interpreter needs a repetition of

21   the question.

22   Q.  When did you start working with Brick Lane Curry House, the

23   defendant restaurant here?

24   A.  2012, end of 2012 or beginning of 2013.

25   Q.  How long you worked?

```
 1              THE COURT:  What does that mean?  When did you stop
 2    working?
 3              MR. VISWANATHAN:  Yes, when did you stop working.
 4    A.   I started in January and left in June.
 5    Q.   Whom did you meet for getting a job at this restaurant?
 6    A.   There was a sign out asking for outside help.
 7    Q.   I'm sorry.  Can you repeat it?
 8              THE INTERPRETER:  The interpreter will repeat.
 9    A.   There was a sign out asking for outside help.
10    Q.   So whom did you meet?
11    A.   The person who was contracting personnel was the chef.
12    Q.   So did he ultimately give you the job?
13    A.   Yes.
14    Q.   Do you recall his name?
15    A.   I don't recall the name but I know that he was in charge of
16    everything.
17    Q.   Were there any other manager at the restaurant?
18    A.   Yes, there were managers.
19    Q.   Do you recall their names?
20    A.   No, I don't recall the names.
21    Q.   Do you remember a manager called "David"?
22    A.   Yes.
23    Q.   Did he speak Spanish?
24    A.   No.  No.  I have to correct that.  He wasn't the manager.
25    The manager is the person that I told you before.
```

G4IAATAPT                          Tapia – Cross

1   Q.  I didn't get you.  Sorry?

2   A.  No, he wasn't.  I would like to correct that.  He wasn't

3   the manager.  The manager was the person I mentioned before.

4   Q.  But do you recall David?

5   A.  Yes.

6   Q.  Do you have working knowledge in English?

7          THE COURT:  In what?

8          MR. VISWANATHAN:  In English language.

9          THE COURT:  Did you have working knowledge in English?

10  Are you asking him if he understood English?  If he understands

11  English?

12         MR. VISWANATHAN:  Yes.

13  A.  Just very little, no, I don't.

14  Q.  You have been living in New York City for the last eight

15  years?

16         MR. CLARK:  Objection.

17         THE COURT:  Sustained.

18  Q.  What were you working as with the restaurant during the

19  period of your employment from January 2013 until June 2013?

20         MR. CLARK:  Objection.

21  A.  I was hired to be a delivery boy but they asked us later to

22  do a lot of other things.

23  Q.  What other things did you do?

24  A.  Beginning with cleaning in the morning, bring the stuff

25  downstairs, milk, chicken and all kinds of meats.  If when the

G4IAATAPT                    Tapia - Cross

beer arrived we have to take it down.  We have to bring

downstairs both the dirty and the clean cloths.  After all that

was done then we have to go down to the basement to clean the

bathrooms and then start preparing food.  We have to chop

onions, then cut the meats.  If the dishwasher was not around

then we have to clean pots and pans.  Then when the day

deliveries arrived upstairs we have to bring everything

downstairs and continue with the same routine.  If there was a

delivery we interrupt it and we'll do it and then we come back

and we continue doing what we were doing before down there.

Q.  You stated you cut meat.  Can you specify which meat you

cut?

A.  Chicken, lamb, goat, fish.  That was it.

Q.  You said you read the complaint, correct?

A.  Yes.

        THE COURT:  Do you have a question, counsel?

        MR. VISWANATHAN:  Yes, your Honor.

Q.  I'm going to refer you to the Exhibit One which is the

declaration, paragraph nine.  Now, would you please read in

paragraph nine on page two the last three lines starting from

"carrying down".

        (Pause)

A.  I cannot read English.

        MR. VISWANATHAN:  Your Honor, may I request the

interpreter to read it to him?

1        THE COURT:  I'll ask the interpreter if you would

2   translate paragraph nine beginning with the words "carrying

3   down".  Do you see it, sir?

4        (Pause)

5        THE COURT:  OK.  Do you have a question?

6        MR. VISWANATHAN:  Yes.

7   Q.  Do you stand by what has been, what he has translated to

8   you?

9   A.  Yes.  And I would like to say something about it.

10       THE COURT:  Go ahead.

11  A.  The question was what I was doing but you didn't specify in

12  which period I was doing what.  My answer involved everything I

13  ever did.

14       THE COURT:  OK.

15       MR. VISWANATHAN:  I'm sorry.  I didn't get your

16  last -- I didn't get your --

17  A.  You asked me what I was doing without specifying when.  My

18  answer -- my response answer about everything I ever did at the

19  restaurant.

20       MR. VISWANATHAN:  I didn't still get you.  But I have

21  referred you to the complaint you filed before this Court, the

22  particular paragraph.

23       THE COURT:  Counsel, this is phenomenally confusing.

24  So you need to get to a point.  So ask a question.  So far as

25  the fact finder based on what he's testified it seems to me

G4IAATAPT                        Tapia - Cross

1   consistent with what's contained in all of paragraph nine.  Is

2   there something else you want to ask?

3              MR. VISWANATHAN:  Yes.

4              THE COURT:  Go ahead.

5   BY MR. VISWANATHAN:

6   Q.  You stated here in the declaration which has been submitted

7   to this Court on March 28, 2016, just before the start of the

8   trial that the three lines on paragraph nine states as follows:

9              Carrying down and stalking vegetables?

10             THE COURT:  It was just translated to him so, OK.

11             MR. VISWANATHAN:  It states that he carried down pork,

12  milk, chicken.  I'm asking a specific question.  Does he stand

13  by the statement here which has been mentioned and which has

14  been explained to him.

15             THE COURT:  Is there something specific you are asking

16  him?

17             MR. VISWANATHAN:  Yes, your Honor.  Does he stand by,

18  specifically, that he carried the vegetables, pork, milk,

19  chicken and other food items, does stand by that statement?

20             THE COURT:  OK.

21  A.  I never carried pork.

22  Q.  Did you carry beef?

23  A.  Yes, but never pork.

24  Q.  But why did you mention in the complaint as in the

25  declaration that has been filed on March 28 --

G4IAATAPT                     Tapia - Cross

1              MR. VISWANATHAN:  May I repeat with your permission,

2    your Honor?  I'm repeating the question because the interpreter

3    is looking at me.

4    Q.  Why it has been mentioned in the trial declaration on

5    paragraph nine that you cut pork that has been submitted on

6    March 28?

7    A.  You mentioned that the manager was David.  You didn't say

8    that.

9    Q.  No.  I'm just now asking you that in the trial declaration

10   submitted on March 28, 2016 before this Court there is a

11   mention of pork.  Why you have mentioned that?

12   A.  Because they called it pork.  We knew that it wasn't pork.

13   But that's the name they gave it, pork.

14   Q.  Who gave it?

15   A.  OK.  The delivery personnel would say, here is the pork.

16   Q.  Again, I didn't understand the delivery person.  I didn't

17   understand who is the delivery personnel?

18   A.  The company that delivered the food stuff will bring the

19   boxes and they will tell us and they will say, here is the

20   pork.

21   Q.  Did you ever cut pork?

22   A.  No.

23   Q.  But you stated you cut beef, correct?

24   A.  Yes, beef, goat, lamb.

25   Q.  Who fixed your weekly working schedule?

G4IAATAPT                    Tapia - Cross

1  A.  When I started it was the chef.  I don't know the name.

2  Q.  And you understood that weekly schedule that was given to

3  you, correct?

4  A.  No.

5  Q.  You did not understand?

6  A.  Basically, we got instructions everyday.  We have our

7  routine that we knew about but then we were told, do this now,

8  do this later, do this now, do this later.  That's all.

9  Q.  I asked you a question.  Were you given a schedule of work

10  before?

11        THE COURT:  Are you asking if he was given a written

12  schedule?

13        MR. VISWANATHAN:  Yes.

14  A.  No.

15  Q.  Typically, on what days in a week you worked during your

16  period of employment?

17  A.  Monday through Saturday.

18  Q.  When did the restaurant normally work on any day?

19        THE INTERPRETER:  Interpreter doesn't understand the

20  question.

21  Q.  When did the restaurant normally work on any day during

22  this time of employment?

23  A.  10:30 to 11.  We arrived there, then we cleaned and then we

24  started with the routine I mentioned before.

25  Q.  Isn't it true that the restaurant opened at 12 noon?

G4IAATAPT                          Tapia - Cross

1    A.  Well, I don't know because we got there earlier.  We do our

2    things, clean-up and then we went downstairs.  I don't know

3    what time they opened.

4    Q.  I'm asking you about the door to the restaurant.  When did

5    it normally open for you to go inside the restaurant?

6    A.  What would normally happen is that we got there, either the

7    doors were opened or someone will come with a key and open the

8    doors for us.

9    Q.  Going back regarding the schedule they would explain to you

10   in English and Spanish, correct?

11              MR. CLARK:  Objection.

12              THE COURT:  Sustained.

13   Q.  When you have to go to deliver outside normally, how did

14   you come to know that a delivery has to be made?

15   A.  Normally, when we come we would come with instructions to

16   have to be delivered so we would see that in the order itself.

17   Q.  Who will handover the delivery package to you?

18   A.  Ron, the guy who usually brought the food upstairs.

19   Q.  Don't you go to the chef and stand next to him to take the

20   delivery?

21   A.  No.  The chef was busy cooking and I was not supposed to

22   stand there waiting for him.

23   Q.  So you never used to go around the kitchen and hang around

24   that, correct?

25   A.  Well, first the kitchen is downstairs.  If there was a

G4IAATAPT                    Tapia - Cross

1    delivery Ron will tell us, here's the delivery to be made.

2    We'll you go upstairs to get the ticket and we leave with it.

3    Q.   Typically, how many deliveries you make in a day?

4    A.   We don't know.  It depended on how busy the restaurant was.

5    Sometimes two, three deliveries.  Other times there was nothing

6    to deliver.

7    Q.   Normally, what a package delivery package contains?

8              MR. CLARK:  Objection.

9              THE COURT:  Sustained.

10   Q.   If the restaurant was busy throughout the day on a typical

11   day?

12   A.   Yeah, it was a busy restaurant, yes.

13   Q.   Normally, when the lunch time is over say, for example,

14   from 12 to three, what do you do after three?

15   A.   To give you an example, if we were cutting or chopping

16   onions it's not that we just did a small portion of onions.  We

17   will chop onions as long as there were onions around.

18   Q.   You stated in the trial declaration which is before you in

19   paragraph five on page one, Mr. Tapia, this says that you saw

20   Mr. Sharma.  First of all to you recognize who is Mr. Sharma?

21   A.   Yes.

22   Q.   Here on paragraph five it says that you saw Mr. Sharma

23   everyday at six p.m., correct?

24   A.   Yes.

25   Q.   And it further says that Mr. Sharma supervised and gave

1    instructions to the manager.  Do you stand by that statement?

2    A.  Yes.

3    Q.  You also further stated here that Mr. Sharma would

4    supervise the cleaning up of places, correct?

5    A.  Yes.

6    Q.  Did you ever spoke to him?  I'm sorry.  Did you ever speak

7    to him?

8    A.  No.  If there was wrong, something dirty he would tell the

9    manager and the manager would talk to us.

10   Q.  How you were paid during your period of employment?

11   A.  In cash.

12   Q.  Did you get paid -- I'm sorry.  I'll rephrase it.

13        How did you get, in what frequency you get paid?

14   A.  Could you ask the question again?

15   Q.  How were you paid?  Were you paid, on a weekly basis or

16   monthly basis or a two weekly?

17   A.  Every week.

18   Q.  Would you -- who paid you your salary?

19   A.  May I point to someone?

20        THE COURT:  You may.

21   A.  OK.  The guy with the black sweater sitting in the back of

22   the court is the one who was paying us.

23   Q.  Is he the person who paid you?  Would you kindly --

24        MR. VISWANATHAN:  Your Honor, he is nodding the head

25   for the record.  He is nodding the head.

G4IAATAPT                    Tapia - Cross

1          THE COURT:  For the record, he's identified a

2     gentleman sitting behind counsel in the observation portion of

3     the courtroom in a black sweatshirt.

4     Q.  Do you recall his name?

5     A.  No.  That was some time ago that I worked there.

6     Q.  So how would you get paid?  Do you normally sit with him?

7     A.  I was told to go upstairs.  He will get the money, give me

8     the money.  He will ask me to sign a piece of paper and that

9     was it.

10    Q.  Isn't it true that you would normally sit with him about

11    what you did during the week and then after that he would repay

12    you the money?

13    A.  No, he never asked any questions.

14    Q.  When you come everyday during the time of your employment

15    you have to go to the person you identified and record your

16    process, correct?

17    A.  I don't understand.

18    Q.  When you come to the work everyday you would go to the

19    person you identified and tell him you are here, correct?

20    A.  No.  He wasn't there at that time.

21    Q.  Then who was that?

22    A.  Normally that was the person who had the key and opened the

23    doors in the morning, either a waiter or another delivery guy.

24    Q.  You stated "another delivery guy", correct?

25    A.  Yes.

G4IAATAPT                    Tapia - Cross

1      THE COURT:  Just for clarification, counsel, you are

2  asking who was there when he started; is that the question?

3      MR. VISWANATHAN:  Yes.

4  Q.  When you left typically everyday after the work at the end

5  of the work, you reported directly to the person you were

6  reporting that you are leaving, correct?

7      MR. CLARK:  Objection.  I do understand that there are

8  some language issues going on here but if there could be just a

9  little bit more clarity than "the person" and the like.

10      THE COURT:  Sustained.  Continue.

11  BY MR. VISWANATHAN:

12  Q.  When you leave everyday after the work at the end of the

13  work, do you report to anyone?

14  A.  No.  By the time we left there was nobody around.  The

15  restaurant was closed and we left from downstairs from a small

16  door we had for that purpose.

17      THE COURT:  I'm asking my deputy to move the

18  microphone closer to my deputy so we can hear the

19  interpretation.

20      (Pause)

21      MR. VISWANATHAN:  Can I go now?

22      THE COURT:  Please.

23  Q.  Did anyone tell you how to do your work?

24  A.  Typically employees who have been working there longer

25  normally show you and teach you how to do your work.

1   Q.  At the end of everyday, did you sit with the manager to

2   account for the tips you earned during the day?

3   A.  Normally the person who to which we return after the

4   delivery will give us the money.  The manager, unless there was

5   a discrepancy will never get involved.

6           MR. VISWANATHAN:  I didn't understand what he said.

7           THE COURT:  I'll repeat.

8           (Read back by the Court)

9   Q.  Isn't it true that at the end of everyday you sat with the

10  manager and accounted for the tips and you got the tips what

11  you earned during that day in the delivery?

12          MR. CLARK:  Objection.

13          THE COURT:  Sustained.  Asked and answered.

14  Q.  Some of the deliveries you made, the customers paid in

15  cash, correct?

16  A.  Some but not many.

17  Q.  When they paid cash they paid the tips also to you,

18  correct?

19  A.  No, because we didn't know.

20  Q.  Can you explain what you did not know?

21  A.  Well, no.  If they were paid in cash I didn't know how much

22  of that cash was a tip.  They wouldn't tell us how much of that

23  cash was a tip.

24  Q.  If you delivered a pack and there was a price mentioned

25  you're collect that much money, correct?

1             MR. CLARK:  Objection.

2             THE COURT:  Overruled.

3             THE INTERPRETER:  Interpreter needs a repetition from

4    the witness, your Honor.

5             (Pause)

6    A.  You are saying that there was a piece of paper that said

7    how much I was supposed to receive.  We never looked at the

8    ticket.  We just gave him the package with the ticket and they

9    just give us cash.  That was it.

10   Q.  So, do you mean to say that you would never look at the

11   bill and look at the money?

12   A.  Are you talking about the tip or are you talking about the

13   amount to collect it?

14   Q.  I'm talking about both.

15   A.  I cannot ask him to add a tip if they pay whatever the

16   ticket says.

17   Q.  That was not my question.  My question was would he collect

18   what was there on the bill from the customer while delivering

19   the packet?

20             MR. VISWANATHAN:  Can I rephrase it if you want?

21             THE INTERPRETER:  Please rephrase it for the

22   interpreter.

23   Q.  Do you mean to say, Mr. Tapia, you would just simply take

24   whatever the customer pays you without ever checking with the

25   bill and just walk out?

1    A.  Yes.  I would never ask for a tip.  I would just take

2    whatever money they would give me and that was it.

3    Q.  Isn't it a practice that a customer normally pays tips?

4           THE INTERPRETER:  Interpreter again needs a

5    repetition.

6           (Pause)

7    A.  I know that the client is supposed to pay for whatever the

8    ticket says but I could not tell him to add anything do it.

9    Q.  I understand that you cannot tell the customer to add tips

10   but what I'm asking you is that isn't it your normal practice

11   that whenever you deliver a packet that customer normally pays

12   tips?

13   A.  Some of them tip and others don't.

14   Q.  When you collect the cash tips whenever you got --

15          THE COURT:  Just a moment, Mr. Viswanathan, because of

16   the translation and because of your accent, I'm really going to

17   ask you to just keep your questions as simple and focused as

18   possible.  You're doing a lot of extraneous talking that makes

19   this process confusing and take longer.  So just the words that

20   you need to ask the question and then let's keep moving.  OK?

21   Q.  You stated that you got cash tips, correct?

22   A.  Yes.

23   Q.  Did you turnover the tips to the manager?

24   A.  No.  The tips are mine.  They're not his.

25   Q.  And there were deliveries which were paid to the credit

1   cards, correct?

2   A.  Correct.

3   Q.  And in those credit cards tips were added, correct?

4   A.  Well, some of them did.  Others will give cash tip.

5   Q.  As regard to the credit card tips, isn't it true that you

6   sat with the manager every night and got cash from the manager?

7           MR. CLARK:  Objection.

8           THE COURT:  Overruled.  This is it.  We're not going

9   to keep asking the same questions, but I'll allow it.

10  A.  It wasn't the manager.  It was the person, the cashier in

11  charge of giving us the tips that gives us the money.

12  Q.  To confirm, so everyday you will, every night you will get

13  the tips which are due to you?

14  A.  Yes.  I received the tips for the day, the same day.

15  Q.  Isn't it true that you can repair bicycles?

16          THE COURT:  The question is, do you repair bicycles?

17          MR. VISWANATHAN:  Yes.

18          THE COURT:  Any objection?

19          MR. CLARK:  Not to that question, your Honor.

20          THE COURT:  All right.

21  A.  No, I don't repair bicycles.

22  Q.  So during your spare time you never went out, sat on the

23  road and repaired your friend's bicycles, correct?

24  A.  No.

25  Q.  In paragraph 17 of the complaint, in paragraph 17 of the

1   legal document you just filed before the Court it is alleged,

2   you have alleged, Mr. Tapia, that you worked from January 2012

3   until October 2012?

4        MR. CLARK:  Objection, your Honor.  The complaint's

5   not in evidence.  I don't think that --

6        THE COURT:  Sustained.

7        MR. CLARK:  Yeah, there's a lot --

8   Q.  But in the trial declaration you have stated that you had

9   worked from January 2013 until June 2013, correct?

10       MR. CLARK:  Objection.

11       THE COURT:  What's the objection?

12       MR. CLARK:  I don't think he's quoting from the trial

13  declaration there.

14       MR. VISWANATHAN:  Paragraph seven on page two states

15  that "I was employed by defendants from approximately January

16  2013 until July 2013".

17       THE COURT:  OK.

18       MR. VISWANATHAN:  And his testimony before this Court

19  at the beginning was that he worked from January 2013 to June

20  2013.

21       THE COURT:  OK.

22  Q.  That's a correct statement, correct.  You never worked

23  before January 2013 for the defendants here?

24  A.  No, I didn't work for them before that date.

25  Q.  You left in June 2013?

G4IAATAPT                        Tapia - Cross

1    A.  Correct.

2    Q.  Why did you leave?

3    A.  Actually, I didn't leave.  The manager asked me to take a

4    leave, to go on vacation and then later he called me and told

5    me that I was no longer needed.  I asked him why and I didn't

6    get an answer.

7    Q.  After you left in June 2013 where did you work?

8    A.  I worked at pizzeria.

9    Q.  Do you still work there?

10            MR. CLARK:  Objection.

11            THE COURT:  Sustained.

12   Q.  Before January 2013 where did you work?

13            MR. CLARK:  Objection.

14            THE COURT:  Is this to relevance?

15            MR. VISWANATHAN:  I'm exploring that he worked at a

16   particular restaurant.

17            THE COURT:  Why?  You have to articulate the relevance

18   or I'll sustain the objection.

19            MR. VISWANATHAN:  Upon information and belief he

20   worked at the restaurant during 2011.

21            THE COURT:  Can you pull up the microphone.  I cannot

22   hear you.

23            MR. VISWANATHAN:  According to information he worked

24   at a restaurant before and he filed a similar FLSA action

25   against that restaurant.

1          THE COURT:  OK.  And the relevance of that is what?

2          MR. VISWANATHAN:  I'm going to ask whether it is his

3     practice of working and filing FLSA actions.

4          THE COURT:  You already did ask that.  You did ask

5     that.

6          MR. VISWANATHAN:  Yes, your Honor.

7          THE COURT:  You asked if it was -- in the beginning of

8     this glorious morning you asked if it was his habit, I think is

9     the word that you used.

10         MR. VISWANATHAN:  But I want to know whether he worked

11    specifically at a particular place so that I can present a

12    document before this honorable court and ask him a question

13    about it.

14         THE COURT:  But what's the relevance?

15         MR. VISWANATHAN:  Does he go to a place, work for six

16    months and then file that FLSA action against the restaurant?

17         THE COURT:  What's the relevance of that?

18         MR. VISWANATHAN:  Isn't it his practice as such,

19    filing such FLSA actions?

20         THE COURT:  I'm going to say it again.  What is the

21    relevance of it?

22         MR. VISWANATHAN:  The relevance would be that our

23    allegation is that these are frivolous complaints.  These are

24    false complaints.  These are exaggerated claims.  And if he has

25    filed an identical action before that he has answered before

G4IAATAPT                          Tapia - Cross

1     this honorable Court that he never filed any such action and I

2     can show you a document and ask him whether he has filed a

3     similar complaint before this honorable Court.

4             THE COURT:  OK.  So you have already asked the

5     question if he has a habit and I think you asked him if he'd

6     previously filed an action; is that correct?

7             MR. VISWANATHAN:  Yes.

8             THE COURT:  So you may not ask those questions again.

9     If you have something you want to do.  For impeachment purposes

10    which I think is what you are saying, I'll take it as it comes

11    but we need to keep moving.  And asking the same question over

12    and over again is not advancing the ball.  So what's the

13    question?

14            MR. VISWANATHAN:  The question is that I want to ask

15    him a specific name whether he --

16            THE COURT:  OK.  Did he work for and see the --

17            MR. VISWANATHAN:  Just a moment.

18    Q.  Before joining the restaurant Brick Lane Curry House, did

19    you ever work for Delizia Restaurant?

20    A.  No.

21            THE COURT:  I'm going to take a midmorning break.  If

22    you intend to show something to the witness for any purpose or

23    to offer anything into evidence, you'll show it to counsel

24    during break and then I can hear if there's any objection.

25            We'll take a ten-minute break.

```
 1            (Recess)

 2            MR. CLARK:  Your Honor, before we resume the

 3    examination if we could have a brief side bar?

 4            THE COURT:  To be out of the hearing of the witness;

 5    is that the reason?

 6            MR. CLARK:  Yes.

 7            THE COURT:  OK.  I think probably the easiest thing

 8    would be to ask the witness to leave rather than moving our

 9    whole operation.  So I'll ask the witness to please just step

10    out.  Any objection to that, counsel?

11            MR. VISWANATHAN:  No objection.

12            THE COURT:  I'll ask Mr. Tapia to please just step

13    outside the courtroom for a moment.

14            (Pause)

15            MR. VISWANATHAN:  Your Honor, during the break I

16    showed to the opponent counsel the previous docket filed by the

17    same law firm.  The docket sheet shows Valentine Tapia's name

18    and he answered before this Court that he never filed any

19    action.

20            MR. CLARK:  Your Honor, if I can explain this and sort

21    of reason why I wanted to address this.  The reason why I

22    wanted address in the side bar is because I didn't want to take

23    up more time in the trial than it otherwise would.  What ended

24    up happening is that this particular plaintiff opted-in to a

25    216(b) collective action.  What defense counsel has in his
```

1    possession are a docket sheet and a complaint that does not

2    contain the plaintiff because the plaintiff was not in the

3    initial complaint.  He opted-into the 216(b) collective action.

4    The defendant does not have a signed consent form which is on

5    the docket sheet in that other case from this particular

6    defendant which I imagine would be really what he would want if

7    he was trying to do impeachment.

8            So I'm sort of open to ways of resolving this that

9    don't involve just spending 20 minutes showing the defendant

10   document that he had no participation in the creation of it at

11   any time and is not going to be able to understand.  Certainly,

12   I think that the plaintiff if given a moment to confirm that

13   Mr. Tapia did, in fact, consent into this prior action, I'm

14   inclined to just stipulate that he did consent in and the Court

15   can sort of take that into whatever consideration it wishes to.

16           Certainly, from certain advocacy side, I don't think

17   that filing, consenting into a previously filed collective

18   action really, just in common English, would be understood as

19   having filed a lawsuit.  But that's sort of the situation.  And

20   I do think that that's what defense counsel is trying to sort

21   of speak to with the materials he has.  However, given that he

22   doesn't have any kind of actual signed document from this

23   plaintiff or a complaint that actually contains this plaintiff

24   in the prior action, I don't see how just from a trial

25   standpoint we're going to be able to productively get to that

1    issue without spending quite a bit of time with back and forth.

2            THE COURT:  Tell me, specifically, what it is you want

3    to do and then I'll hear if there is an objection.

4            MR. VISWANATHAN:  Your Honor, my point here is that I

5    want to bring it to the Court's attention that there are two or

6    three factors of that.  He answered that he never filed any

7    lawsuit.  He was never a part of the lawsuit before this Court

8    and never worked for Delizia.  These are the two statements he

9    made.

10           THE COURT:  He said he did or did he say he didn't?

11           MR. VISWANATHAN:  He didn't recognize the name Delizia

12   Restaurant that he worked.  He said "no".  Before working with

13   the defendant here, did he work with the Delizia?  And he said

14   "no".  His name clearly appears on the docket as one of the

15   plaintiffs, your Honor.

16           THE COURT:  So he opted-in.  That is to say he wasn't

17   part of the complaint but he opted-into the action?

18           MR. VISWANATHAN:  That is not clear --

19           MR. CLARK:  That is --

20           MR. VISWANATHAN:  -- from the docket sheet, your

21   Honor.  I have a complaint of -- original was filed.  The

22   complaint contained his name.  Obviously, he must have opted-in

23   but the docket sheet does not contain.  The title definitely

24   shows that he was one of the parties against Delizia Restaurant

25   which was filed in 2012.

G4IAATAPT                        Tapia - Cross

1          THE COURT:  So all of this is to get, so he said he

2     didn't work for Delizia and he said he wasn't involved in a

3     lawsuit and you want to show that he did work for Delizia and

4     that he was involved in a lawsuit; is that the whole ballgame

5     or is there anything else?

6          MR. VISWANATHAN:  One last point, your Honor, if I

7     may?  He answered repeatedly -- I know that this Court might

8     have got kind of annoyed with me as to my repeated question on

9     that.

10          THE COURT:  It's not annoyed.  It's my job to keep the

11     process moving especially when we have language difficulties

12     and interpretation, I'm going to sustain asked and answered.

13     I'm not going to allow repeated questions and I'm going to make

14     sure the questions are clear and focused.  So it's not

15     annoyance.  It's just me doing my job.

16          MR. VISWANATHAN:  I understand.  Third point was, your

17     Honor, he for the first time met the attorneys here, met the

18     attorneys who are representing here for the first time in 2015,

19     then after he said 2014 at the time of filing the complaint.

20     That's why I explored very extensively.  This complaint as

21     filed in 2012.  And according to the complaint he worked

22     sometime in 2011, the allegations in the complaint.

23          THE COURT:  It's the same law firm or the same

24     attorneys?

25          MR. VISWANATHAN:  Same law firm, your Honor.

1           THE COURT:  Do you know if this is him or the same

2      name or what?

3           MR. CLARK:  I'm not absolutely certain sitting here.

4      Certainly, it is the same name, so I'm inclined to think it

5      could be the same person.  It is an opt-in so that doesn't

6      necessarily mean he had any real serious interactions with the

7      law firm.  My gathering is that defense counsel isn't

8      intimately familiar with the way 216(b) actions work.

9      Certainly, my understanding would be that the complaint would

10     be filed, that there would be notice dispersed after a finding

11     that similarly situated individuals could exist and whether

12     there was consent pursuant to notice or just consent pursuant

13     to him finding out about the lawsuit from other individuals

14     that then consent form was filed and then it resolves itself

15     however it resolved itself.  The fact that the consent was

16     filed would automatically add him to the docket sheet which was

17     why he is on the docket sheet.

18          Now, certainly, I'm content with some of the issues

19     that he raised to let the record speak for itself.  Certainly,

20     the questions that he was asking earlier today were particular

21     to whether he particularly filed a lawsuit in the Southern

22     District of New York, which I think is completely

23     understandable given the posture of this previous case why he

24     would authentically believe that.

25          Nevertheless, I do understand that he might seek to

1    get some impeachment value out of this.  We are willing to

2    stipulate that he did in fact opt-in to that lawsuit but I'm

3    not sure of.  We can at least move forward without the time

4    spent by the Court of us going through an impeachment process

5    which is going to be difficult if defense counsel doesn't

6    actually have the consent form for this plaintiff.

7                THE COURT:  The witness comes back you'll ask him

8    again, did you ever work at this restaurant?  Did you ever work

9    there?  Do you have the address?

10               MR. CLARK:  I do know that the complaint should have

11   that which I believe defense counsel does have a copy of.

12               THE COURT:  Do you have an address?

13               MR. VISWANATHAN:  The address is not there.

14               MS. GUTIERREZ:  It's in the complaint.

15               MR. VISWANATHAN:  Yes, your Honor.

16               THE COURT:  So my proposal is you ask him, did you

17   ever work at Delizia Restaurant, spell the name.  However he

18   answers it, did you ever work at a business at the following

19   address?  State the address.  Were you ever involved in any way

20   in a lawsuit involving this company?  And state the name.  OK?

21   If his answers are consistent with what I understand his

22   answers were before, his answers will be "no" to those things

23   and we'll figure out a process for you to establish that that

24   appears to be inaccurate.  OK?  And then your impeachment

25   purposes will be met and you can make whatever arguments you

1    want to make with respect to that.  But we don't need a back

2    and forth I don't think complicated process if he is saying

3    something and you have a basis that's permissible under the

4    rules to establish to the contrary, then you can make that

5    point to me and then you can make arguments to me based on what

6    that shows.  Is that fair?

7             MR. VISWANATHAN:  Yes, your Honor and the last

8    question would be that, did you ever meet --

9             THE COURT:  And you have to be clear.  He might think

10   of these two folks as the lawyers versus the law firm.  So you

11   could say -- I'll propose.  You tell me.  The fourth question

12   would be, prior to this case, did you ever have any involvement

13   with lawyers at Michael Faillace & Associates PC.

14            Is that OK?

15            MR. VISWANATHAN:  Yes, your Honor.

16            MR. CLARK:  Agreed, your Honor.

17            THE COURT:  All right.  So we we'll do those questions

18   and then we can deal with how you want to establish which it

19   sounds like they'll stipulate to if it's true.  I think we have

20   to deal with the question, is it him.  I don't know if

21   Valentine Tapia is a common name or not but if it's your law

22   firm, I think we could figure it out.  And I'll let you then

23   come to a stipulation as to the facts of those issues and that

24   we're not playing complicated through interpreter word games or

25   what who the lawyers are.  You'll give me what I need.

1              After we do that, anything further with this witness?

2              MR. VISWANATHAN:  Maybe one or two questions.

3              THE COURT:  All right.  So we'll finish with this

4      witness.  OK?  We'll bring the witness back.  Thank you,

5      counsel.

6              (Pause)

7              THE COURT:  You may come forward.  You may be seated.

8              Mr. Tapia, we will resume questioning and I remind you

9      that you are under oath.

10             OK, counsel.

11     BY MR. VISWANATHAN:

12     Q.  Mr. Tapia, did you ever work for a restaurant named Delizia

13     Restaurant, D-E-L-I-Z-I-A?

14             THE COURT:  D-E-L-I-Z-I-A?

15     A.  Yes.

16     Q.  During which period you worked for them?

17     A.  About four for five years ago.

18     Q.  Is it the same restaurant which is located at 1374 First

19     Avenue, New York, New York 10021?

20     A.  Yes.

21     Q.  Did you file or become a part of a lawsuit against Delizia

22     Restaurant?

23     A.  Yes.

24     Q.  For what purpose did you contact the same law firm, Michael

25     Faillace & Associates?

G4IAATAPT                    Tapia - Cross

1   A.  No, I didn't communicate with them.  There were some other

2   people.

3   Q.  Can you name the people?

4   A.  Marcus, Gabrielle, Benjy, and two others I don't recall the

5   names.

6   Q.  If I may clarify with you, you are naming the other

7   plaintiffs who are named in the complaint?  I will repeat those

8   names as per the lawsuit.  That is Gabrielle -- Hilario

9   Rodriguez?

10  A.  Correct.

11  Q.  Marcos Marius?

12  A.  Correct.

13  Q.  Juan Alejandro?

14  A.  Yes.

15  Q.  Edgar Benjamin?

16  A.  Yes.

17  Q.  And Elias Rojas?

18  A.  Yes.

19  Q.  Is it your statement before the Court today that you never

20  met Mr. Joshua Androphy or Mr. Michael Faillace?

21          MS. GUTIERREZ:  No, no, we're not either of those

22  people.

23          MR. CLARK:  Objection, your Honor, timeframe for that

24  particular question.

25          THE COURT:  Folks, this is getting a little unruly,

1   OK?  So your interpreter is going to interpret what he hears.

2   You have an objection, you state "objection".  I hear a

3   specific objection on timeframe.

4           I do need to ask again Mr. Viswanathan just real clear

5   questions.  Cut the words down to just exactly what you're

6   asking.  Direct questions I think will help be clear.

7   Obviously, you are entitled to cross but a lot of "isn't it

8   true" just make it more difficult but if you can just simple

9   clear-cut direct questions.  Is what you're getting after if he

10  had any prior involvement with lawyers at the Faillace firm; is

11  that it?

12          MR. VISWANATHAN:  That is it, your Honor.

13          THE COURT:  So the question is, prior to this lawsuit,

14  Mr. Tapia, did you have any involvement with lawyers at the law

15  firm of Michael Faillace & Associates?

16  A.  No, nothing to the lawyers.

17          THE COURT:  All right.  Thank you.  Redirect?

18          MR. CLARK:  If I could just have a moment to speak to

19  co-counsel.

20          THE COURT:  You may return.  You said you had no

21  further questions, right, counsel?

22          MR. VISWANATHAN:  Apart from the two or three, just

23  last two questions.

24          THE COURT:  OK.  Go ahead.

25  BY MR. VISWANATHAN:

G4IAATAPT                    Tapia - Cross

1   Q.  Mr. Tapia, you have complained before this Court that you

2   had not overtime wages which were due to you, correct?

3   A.  No, I wasn't paid.

4   Q.  Did you ever complain to the manager that you're not being

5   paid?

6   A.  No, because what they told me you are going to make so much

7   and that's it.  How can you ask for more than what you have

8   told you.

9   Q.  Isn't it true that you did not work extra hours?

10              MR. CLARK:  Objection, your Honor.

11              THE COURT:  Sustained.

12              MR. VISWANATHAN:  I have no further questions.

13              THE COURT:  All right.  Thank you.

14              MR. CLARK:  If I could confer with co-counsel?

15              THE COURT:  Take a moment but please hurry.

16              (Recess)

17              MR. CLARK:  There is no redirect, your Honor.

18              THE COURT:  Thank you.  Mr. Tapia, you may step down.

19   You are excused.

20              Plaintiff may call next witness, returning exhibits to

21   counsel to manage their own exhibit.

22              MR. CLARK:  Thank you, your Honor.

23              MS. GUTIERREZ:  We're going to call Eufemia Castillo.

24              THE COURT:  Ms. Castillo may come forward.

25    EUFEMIA CASTILLO,

G4IAATAPT                    Castillo - Direct

1         called as a witness by the Plaintiffs,

2         having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MS. GUTIERREZ:

5    Q.  Good afternoon, Ms. Castillo.

6    A.  Good afternoon.

7         MS. GUTIERREZ:  May I approach the witness with

8    Plaintiff's Exhibit Three?

9         THE COURT:  Yes, you may.

10        (Pause)

11   Q.  Ms. Castillo, do you recognize the document that I've just

12   handed you?

13   A.  Yes.

14   Q.  OK.  And the Plaintiff's Exhibit Three, the declaration

15   that you intend to act as your direct testimony in this case?

16   A.  Yes.

17   Q.  And if could you just take a moment to look through that

18   and turn to the last page?

19   A.  I cannot read very well and I cannot see very well either.

20   Q.  Do you recognize the signature on the last page as your

21   own?

22   A.  Yes.

23   Q.  And prior to signing that document was that translated to

24   you in Spanish?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G4IAATAPT                    Castillo - Direct

1          MS. GUTIERREZ:  At this time I'd simply like to move

2    Ms. Castillo's declaration into evidence as Plaintiff's Exhibit

3    Three.

4          THE COURT:  Any objection, counsel?

5          MR. VISWANATHAN:  No objection.

6          THE COURT:  All right.  Plaintiff's Exhibit Three is

7    admitted as the direct-examination of Ms. Castillo.

8          (Plaintiff's Exhibit Three received in evidence)

9          MS. GUTIERREZ:  Referenced within Plaintiff's Exhibit

10   Three, although it has a different exhibit number I believe in

11   the actual declaration, certain payroll records which I'm

12   marking now as Plaintiff's Exhibit Four here at trial.

13         THE COURT:  OK.  And --

14         MS. GUTIERREZ:  I'd like to move this into evidence as

15   Exhibit Four.

16         THE COURT:  And how do I know what those are?

17         MS. GUTIERREZ:  They are Tab Three.

18         THE COURT:  So what had been submitted prior to trial

19   Tab Three is marked now as Plaintiff's Exhibit Four and that

20   consists of five pages; is that correct?

21         MR. VISWANATHAN:  Correct, your Honor.

22         THE COURT:  And it's again, a table with pay period

23   amount, signature and name and in the upper left date is 2013

24   and the name is written in the upper right is E-U-F-E-M-I-A; is

25   that correct?

G4IAATAPT                   Castillo - Cross

 1              MS. GUTIERREZ:  That's what it looks like, correct.

 2              THE COURT:  That is --

 3              MS. GUTIERREZ:  Correct.

 4              THE COURT:  On the other pages it's "Eufemia" is

 5     written out.

 6              Any objection, counsel?

 7              MR. VISWANATHAN:  If I may have a copy?

 8              MS. GUTIERREZ:  Yes.

 9              (Pause)

10              MS. GUTIERREZ:  Again, these were produced by the

11     defendants.

12              MR. VISWANATHAN:  No objection.

13              THE COURT:  All right.  So if I already admitted

14     Plaintiff's Exhibit Three which is the direct testimony and I'm

15     also now admitting Plaintiff's Exhibit Four, the record which

16     we've now discussed that are in the testimony.

17              MS. GUTIERREZ:  Yes.  No further questions.

18              THE COURT:  All right.  Thank you.

19              Mr. Viswanathan.

20     CROSS-EXAMINATION

21     BY MR. VISWANATHAN:

22     Q.  Good afternoon, madam.

23     A.  Good afternoon.

24     Q.  How old are you?

25     A.  Sixty.

G4IAATAPT                    Castillo - Cross

1   Q.  How long have you worked with Brick Lane Curry House?

2   A.  I worked there since 2012 to 2014.

3   Q.  Could you be specific in which month you started in 2012.

4   A.  November 1st.

5   Q.  Did you stop working in between?

6   A.  Yes.  I had an accident and I stayed home for three days.

7   Q.  Apart from the accident, were you sick?

8   A.  No, never.

9   Q.  Isn't it true that the manager asked you to go to your

10  doctor and get doctor a certificate of fitness?

11          MS. GUTIERREZ:  Objection.

12          THE COURT:  Grounds?

13          MS. GUTIERREZ:  Whether or not, I don't know if it has

14  bearings on the underlying facts of this case.

15          THE COURT:  What's the relevance, counsel?

16          MR. VISWANATHAN:  The witness here was sick many times

17  and they're starting to arrange her to be seen by a doctor.

18  And in fact the respondent manager went --

19          THE COURT:  You are saying she was sick and the

20  employer assisted her?

21          MR. VISWANATHAN:  She was sick and she could not

22  attend to the work and the restaurant requested her to go and

23  obtain a fitness certificate which she obtained and provided

24  the restaurant.  According from the fact the restaurant had in

25  fact called -- took videos and went to her home and even

1    provided her letter.

2             THE COURT:  What's the relevance of that to this

3    lawsuit?

4             MR. VISWANATHAN:  The witness is going to answer that

5    she's been to doctors.  I would have -- I would only ask a

6    specific doctor whether -- and certainly at that time.

7             THE COURT:  You still haven't articulated the specific

8    relevance to the lawsuit.

9             MR. VISWANATHAN:  The defense is that she was sick

10   most of the time and she could not have done the number of

11   hours of work which she has claimed along with that 73.7 hours

12   per week which would have been impossible for her to carry out.

13            THE COURT:  All right.  Counsel?

14            MS. GUTIERREZ:  To the extent that some certificate or

15   doctor's note or something is going to be shown to the witness

16   I would certainly object to its production during this trial

17   right now.  Other than that he is welcome to ask her about the

18   hours that she worked.  I don't know about going down the path

19   of long term illness and nothing has been turned over.

20            THE COURT:  You can ask question to the extent you are

21   trying to impeach the testimony of the hours of work.  If you

22   have a good faith basis to ask the questions you may do so.

23   We'll see what the constraints are as we get them.

24            MR. VISWANATHAN:  At the moment I'm going to show --

25            THE COURT:  No.  You can ask questions.

1          MR. VISWANATHAN:  As we have information that previous

2      has submitted a copy of the letter, the doctor letter that she

3      was fit to work.

4          THE COURT:  Ask your question, counsel, and then if

5      there is something you are seeking to either show the witness

6      if you have a basis in evidence or to seek its admission we can

7      take up the question of whether it was disclosed during

8      discovery and marked as an exhibit and the like.

9          MR. VISWANATHAN:  Yes.

10     Q.  Ms. Castillo, what is your nature of work?

11         MS. GUTIERREZ:  Objection.  When?  Where?

12         THE COURT:  Sustained.

13     Q.  What did you do at the Brick Lane Curry House?

14     A.  I was hired as a dishwasher and as I said, I was hired as

15     dishwasher but I was asked to clean onions, shrimps and then

16     also to clean the bathrooms and to clean the stairs, to clean

17     the hoods at the kitchen.

18     Q.  What payment did you receive?

19     A.  When I started they would pay me 350 for six days.

20     Q.  My question to you was different.  What time of day during

21     your employment with Curry Lane you started work?

22         MR. VISWANATHAN:  I'm going to rephrase, your Honor,

23     if I may?

24         THE COURT:  Yes.

25     Q.  What time did you start work everyday?

G4IAATAPT                   Castillo - Cross

1   A.   When I started it was from 11 in the morning till 11 at

2   night, 11 to 11.

3   Q.   But isn't it true that because you have your health

4   conditions you were told by the manager to come at what ever

5   time you want and leave at what ever time you want?

6   A.   No, no, sir.

7   Q.   You were paid for the period during which you attend to

8   work, is it true?

9   A.   No.

10  Q.   During your daily work schedule you were allowed free time

11  to sit and rest whatever time you wanted?

12  A.   No, I was not allowed any rest time.  Later on I decided to

13  take 15 minutes on my own because there was, they would not

14  allow me to be sitting.  We were not allowed to be idle.

15  Q.   You stated in the declaration on paragraph four that you

16  observed Mr. Sharma to be integrally involved in the everyday

17  of her --

18  A.   Yes.

19  Q.   What do you mean by "integrally involved"?

20  A.   Ordering and supervising what we had to do and they would

21  call me to wash the pots and pans and also to wash dishes.  So

22  I was actually working on two different lines.

23  Q.   My question is just about Mr. Sharma.  You stated in

24  paragraph five that Mr. Sharma came to the restaurant everyday

25  at one p.m., correct?

1    A.  Yes.

2    Q.  Did he come everyday?

3    A.  Yeah, I would see him there.  I was downstairs and I would

4    see him there.

5    Q.  On paragraph eight you have stated that?

6    A.  My eyes are not that good.  That I cannot see.

7    Q.  OK.  You state that apart from cleaning you also cleaned

8    the refrigerator and cleaned onions, shrimp, meats and other

9    foods.  What other different types of meat that you cleaned?

10   A.  The beef or whatever they call it, and chicken.  That's

11   all.

12   Q.  Isn't it true that the manager gave you a job because you

13   desperately needed a job?

14   A.  The manager didn't give me the job.  It was the chef.

15   Q.  The job at the Brick Lane Curry House the chef give you a

16   job out of humanitarian conservation to you?

17            MS. GUTIERREZ:  Objection?

18            THE COURT:  Sustained.

19   Q.  Isn't it true that you were too weak to do any of the jobs?

20            MS. GUTIERREZ:  Objection.

21            THE COURT:  Sustained.

22   Q.  Isn't it true that you only worked at the restaurant four

23   for five days a week?

24   A.  At the beginning I was working six days and then the work

25   was reduced to five days per week.

1    Q.  Isn't it true that the chef or the manager sent you to make

2    delivery nearby?

3    A.  Yes, but that was very late.  It was -- I did that for a

4    very short time.

5    Q.  The manager did that specifically so that you can earn some

6    extra money, correct?

7         MS. GUTIERREZ:  Objection.  I don't understand the

8    question.

9         THE COURT:  What's the relevance?

10        MR. VISWANATHAN:  Even though her job was a dishwasher

11   the manager and the chef at all times took care of her because

12   of her health and not only that because of her financial

13   situation she used to ask for -- she needed extra money which

14   the manager and chef specifically insured that she went to the

15   near buildings, it's not very far, to nearby places around to

16   deliver the packages so that she can earn tips.

17        THE COURT:  What is the relevance?  You are saying

18   that she worked additional hours?

19        MR. VISWANATHAN:  No, your Honor.  She earned extra

20   money which the manager and chef especially insured even though

21   delivery was not part of her job.

22        THE COURT:  You are saying she earned money through

23   delivery.

24        MR. VISWANATHAN:  Tips and the restaurant manager and

25   chef.

1           THE COURT:  All right.  Rephrase the question clearly
2    and I'll allow some amount of questioning if you are trying to
3    get at what her compensation was.
4    Q.  Isn't it true that you needed extra money --
5           THE COURT:  Sustained.  Her needs are, her needed
6    money is irrelevant.  But if you have questions about what she
7    worked and what she was compensated for, then that's
8    permissible.
9    Q.  Isn't it true that the manager or the chef called you and
10   told you to go and deliver to the nearby places?
11          THE WITNESS:  Yes.
12   Q.  Who in the restaurant assigned your duties?
13   A.  At the beginning it was the chef, the one who told me what
14   to do.  But after that new people came to work at the
15   restaurant and they were just moving me around as needed, as
16   they needed different persons.
17   Q.  As for the exhibit before you, Exhibit Four --
18          THE COURT:  The declaration or the time sheet
19   Plaintiff's Exhibit Four.
20          MR. VISWANATHAN:  May I approach?
21          THE COURT:  You may.
22          (Pause)
23   A.  As I told you, I cannot see.  No, I can't.
24   Q.  The exhibit which is before you shows that she received at
25   times $290 per week and at times $350 per week.

G4IAATAPT                    Castillo - Cross

1          THE COURT:  What is the question?

2   Q.  You agreed that you received the amount which is shown

3   here, correct?

4   A.  No.  At the beginning it was 350 because they worked six

5   days.

6   Q.  In one of the weeks on page number one it is shown as $58.

7   Is it because you were sick during that week?

8   A.  I was never paid $58.  That never happened no time.

9   Q.  Isn't it true that you stopped working in the month of

10  April 2014?

11  A.  No, October 5, 2014.

12  Q.  You stated here that you cannot see properly and if you

13  cannot see properly how do you claim that you worked for

14  sometimes six days a week?

15         MR. CLARK:  Objection.  Nothing before her talks about

16  the days of week that she works so there is nothing that she

17  should have to read on there.

18         THE COURT:  I will sustain the objection because I

19  find the question confusing.  You can rephrase.

20         MR. VISWANATHAN:  I'm going to rephrase the question.

21  Q.  If you claim that you cannot see properly, how can you work

22  the various tasks which you have claimed in the declaration?

23  A.  Yes, because I'm trying to look at them.  I'm sorry.

24         THE INTERPRETER:  Interpreter didn't understand the

25  question.

1        THE COURT:  Ms. Castillo, your eyesight makes it

2   difficult for you to read; is that correct?

3        THE WITNESS:  Yes, yes.

4        THE COURT:  Does your eyesight prevent you from doing

5   other tasks?

6        THE WITNESS:  Sometimes it's difficult for me.

7        THE COURT:  Did your eyesight issues prevent you from

8   doing the work at this restaurant?

9        THE WITNESS:  No, not at that time.  I didn't have

10   that at that time.

11        THE COURT:  Your eyesight problems have become worse.

12        THE WITNESS:  Yes.  It started getting worse at the

13   restaurant.

14        MS. GUTIERREZ:  Objection to the translation.

15        THE COURT:  Well, unless you have another interpreter

16   you want to come in to interpret then I have no way of knowing

17   except for the interpreter you proposed and he was un-objected

18   to.

19        MS. GUTIERREZ:  She said (speaking another language).

20        THE COURT:  Counsel, you are the lawyer.  He is the

21   interpreter.  You want to bring in another interpreter, that's

22   fine.

23        MS. GUTIERREZ:  I'm sorry.  We can move on.

24        THE COURT:  All right.

25   Q.  Did you ever cut meat?

G4IAATAPT                    Castillo - Cross

1            THE COURT:  Did you ever cut meat; is that the

2    question?

3    Q.  When you were working; yes.

4    A.  Yes, the meat they called "lamb".

5    Q.  If you are too weak, how can you cut meat?

6            MS. GUTIERREZ:  Objection.

7            THE COURT:  Sustained.

8    Q.  You stated that you saw Mr. Sharma at one p.m. everyday,

9    correct?

10   A.  Uh-huh, yes, that's right.

11   Q.  But the other plaintiffs in this case have mentioned

12   different times that they saw Mr. Sharma?

13           MS. GUTIERREZ:  Objection.

14           THE COURT:  Sustained.

15   Q.  Can you tell me what time the restaurant opened everyday

16   during your employment time?

17   A.  I would get to the restaurant at 11 o' clock every day.  My

18   hours to start was 11 o'clock.  And I don't know, at the time

19   the restaurant was open.  I don't know that they opened that

20   before to clean other something else but it was opened at 11

21   o'clock when I arrived everyday.

22   Q.  In paragraph 11 of the declaration it was stated that from

23   November 1st of 2012 until February 2013 you worked for 75

24   hours typically every week?

25   A.  Every week, yes.

1    Q.  With your health conditions can you work 75 hours every

2    week?

3              MS. GUTIERREZ:  Objection.

4              THE COURT:  Sustained.

5    Q.  Do you know that the restaurant opened only for 77 hours

6    every week and with your Friday schedule how can you work 75

7    hours?

8              MS. GUTIERREZ:  Objection.

9              THE COURT:  Sustained.

10   Q.  Have you ever consulted with a doctor by the name Sanjit

11   Chopra?

12             MS. GUTIERREZ:  Objection.

13             THE COURT:  I don't know where this is going to go.

14   I'll give you a little bit of room but you can ask the

15   question.  Overruled.  I don't know what the relevance is, so

16   if it doesn't become clear I'll stop the question.

17   A.  No.

18             MR. VISWANATHAN:  Your Honor, may we approach?

19             MS. GUTIERREZ:  Objection.  If he is approaching with

20   something I've never seen before, I absolutely have an

21   objection.

22             MR. VISWANATHAN:  This is said to be issued by a

23   doctor.  I can ask one more question if you she can

24   recollection memory.

25             THE COURT:  Well, you can show it to opposing counsel.

G4IAATAPT                    Castillo - Cross

 1              MR. VISWANATHAN:  OK.

 2              (Pause)

 3              MS. GUTIERREZ:  I've never seen this before.  It was

 4    never produced during discovery.  This is the first I've see

 5    it.  It certainly would be a surprise to us.  We've completely

 6    not looked at anything like that preparing for this trial and

 7    it is a surprise at this moment.

 8              THE COURT:  Was it produced in discovery?

 9              MR. VISWANATHAN:  I'm not very sure, your Honor.

10    Previous counsel had produced according to the information

11    given by my client he gave to the previous counsel and

12    according to him it was produced.

13              THE COURT:  It's your job, is it not, counsel to know

14    what was produced in discovery?  Here is what we'll do.  It's

15    not coming in but if you want to show it to her to see if this

16    refreshes her recollection, you may do that.  You can show it

17    to her, ask her if this refreshes her recollection.  If the

18    answer is "no" we'll move on and I'll take it only for what it

19    is.  And I'm not sure how we'll deal with the eyesight issue

20    but that's your problem.

21              (Pause)

22              THE COURT:  Can you see that?  And is it something

23    you've ever seen before?

24              THE WITNESS:  No, no, no.

25              THE COURT:  May I see it?

G4IAATAPT                       Castillo - Cross

1             (Pause)

2             THE WITNESS:  I haven't seen that before.

3             THE COURT:  And do you have any familiarity with the

4    doctor named Sanjit Chopra, C-H-O-P-R-A?

5             THE WITNESS:  To tell you the truth, no.

6             THE COURT:  Have you ever seen a doctor at a place

7    called Family Practice and Pediatrics?  And the address is 3231

8    Steinway Street in Astoria.

9             THE WITNESS:  Yes, yes, now I remember.  They

10   themselves took me there.  They thought I was crazy or

11   something like that and they took me there.  I don't know why

12   they took me there.

13            THE COURT:  Were you examined by a doctor there?

14            THE WITNESS:  Yes.  He examined me and he said that I

15   was fine, that I didn't have anything.

16            THE COURT:  OK.

17            THE WITNESS:  In Astoria.  Yes, they took me there and

18   I don't know why they took me there.

19            THE COURT:  OK.  Next question?

20   BY MR. VISWANATHAN:

21   Q.  Have you ever complained to your manager that you are not

22   being paid for your hours worked?

23   A.  Yes.  When I left the place because I was fired and the

24   chef actually fired me and I went to talk to the manager.

25   Q.  What happened after that time?

1          MS. GUTIERREZ:  Objection as to timeframe.

2          THE COURT:  Sustained.

3   Q.  You stated that you worked up until October 2014, correct?

4   A.  Yes.

5   Q.  Do you recall when did you see the lawyers who are

6   representing you in this case?

7   A.  2014 I have never seen them before.

8   Q.  But can you recall which month you saw the lawyers?

9   A.  No, I don't recall.

10  Q.  If I might impress you?

11  A.  It was 2014.

12  Q.  You have stated in the declaration here that you worked --

13  A.  Yes, after 2014.

14  Q.  For the purpose of the court reporter I'm going to repeat

15  the question.  You have stated in the trial declaration that

16  you worked with Brick Lane Curry House until October 2014,

17  correct?

18  A.  Uh-huh, yes.

19  Q.  So you saw the attorneys after you stopped working with the

20  Brick Lane Curry House, correct?

21  A.  Yes, afterwards.

22  Q.  Can you say you met them in November 2014 or December 2014?

23         MS. GUTIERREZ:  Objection.

24         THE COURT:  Sustained.

25  Q.  You know that you have filed a complaint before this court,

G4IAATAPT                    Castillo - Cross

1   correct?

2   A.  I beg your pardon?

3          THE COURT:  Are you asking her if she is aware that a

4   lawsuit was filed?

5   Q.  In your name against the defendant in this court, correct?

6   A.  Yes.

7   Q.  And are you aware that this lawsuit was filed on October

8   24, 2014?

9   A.  Yes.

10  Q.  That is approximately the same time you were working with

11  Brick Lane Curry House?

12         MS. GUTIERREZ:  Objection.

13         THE COURT:  Sustained.

14  Q.  Did you meet the lawyers while you were working at the

15  Brick Lane Curry House?

16         MS. GUTIERREZ:  Objection.

17         THE COURT:  Go ahead.  I'll allow it.

18  A.  No.

19         MR. VISWANATHAN:  Thank you.  No further questions at

20  this time.  Your Honor, I'm sorry.  I apologize.

21  Q.  Ms. Castillo, I apologize.  You are claiming that you're

22  not being paid overtime wages only because the others have

23  asked you to join in this action, correct?

24         MS. GUTIERREZ:  Objection.

25         THE COURT:  Sustained.

G4IAATAPT                          Castillo - Cross

1   Q.  Just for the clarity, you never, ever complained that you

2   were not being paid, correct?

3                MS. GUTIERREZ:  Objection.

4                THE COURT:  Sustained.  I do not understand the

5   questions you have been asking about the complaint in the

6   lawsuit.  And also I think asked and answered to the extent I

7   understand your question.

8   BY MR. VISWANATHAN:

9   Q.  Isn't it true that you were paid more than what you worked

10  during your employment?

11               MS. GUTIERREZ:  Objection.

12               THE COURT:  Sustained.

13  Q.  The complaint that you were not paid for your work is

14  untrue 'is not correct?

15               MS. GUTIERREZ:  Objection to phrasing.

16               THE COURT:  Sustained.  It's unclear, counsel, and I'm

17  not going to allow an utterly confusing nonsensical record.  So

18  you have it by all means if you want to try to rephrase, you

19  certainly can.

20               MR. VISWANATHAN:  One last.

21               THE COURT:  All right.

22  Q.  The complaint here before this Court is false.  The

23  complaint that you have not been paid is false?

24               MS. GUTIERREZ:  I'm going to object because I don't

25  see a question.

1              THE COURT:  You are asking if her complaint is false?

2              MR. VISWANATHAN:  Yes.

3              THE COURT:  What complaint are you talking about?  Are

4      you talking about the complaint that was filed in this action?

5              MR. VISWANATHAN:  Yes, your Honor.

6              THE COURT:  Is her lawsuit false; that's the question?

7              MR. VISWANATHAN:  Yes.

8              THE COURT:  Is your lawsuit false?

9      A.  No.

10             THE COURT:  OK.  Thank you.

11     A.  And not only that after first they fired me again, then

12     they didn't pay me for it.

13             THE COURT:  Any redirect?

14             MS. GUTIERREZ:  No redirect.

15             THE COURT:  Thank you.  You may step down.

16             We'll break for lunch and resume with the third and

17     the final plaintiffs' witness and then proceed to the defense

18     case.

19             All right.  So it's 12:30.  We'll resume at 1:30.

20             (Luncheon Recess)

21

22

23

24

25

1                          AFTERNOON SESSION

2                              1:30 p.m.

3            THE COURT:  Any preliminary matters before we get

4    started?

5            MS. GUTIERREZ:  No, your Honor.

6            MR. VISWANATHAN:  No.

7            THE COURT:  Plaintiff may call its next witness.

8            MS. GUTIERREZ:  Plaintiffs call Romulo Ricano

9    Balderas.

10    ROMULO RICANO BALDERAS,

11         called as a witness by the plaintiffs,

12         having been duly sworn, testified

13         through Spanish language interpreter as follows:

14            THE COURT:  Your name, sir, is last name Balderas,

15   B-A-L-D-E-R-A-S, correct?

16            THE WITNESS:  Yes.

17            THE COURT:  First name is Romulo, R-O-M-U-L-O?

18            THE WITNESS:  Yes.

19            THE COURT:  Thank you.

20   DIRECT EXAMINATION

21   BY MS. GUTIERREZ:

22   Q.  Good afternoon, Mr. Balderas.

23   A.  Good afternoon.

24            MS. GUTIERREZ:  May I approach the witness?

25            THE COURT:  Yes.  You're showing what has been marked

G4I8TAP2                        Balderas - direct

1    as?

2                MS. GUTIERREZ:  Plaintiffs' Exhibit 5.

3    Q.  Mr. Balderas, do you recognize the document that's been

4    marked as Plaintiffs' Exhibit 5?

5    A.  Yes.

6    Q.  Is the document that's in front of you, Plaintiffs' 5, the

7    declaration that you have submitted which is meant to be your

8    direct testimony in this trial?

9    A.  Yes.

10   Q.  If you could just take a moment to look through that and go

11   to the last page.

12               Is that your signature that appears on the last page?

13   A.  Yes.

14   Q.  Before signing that document, was it translated to you in

15   Spanish?

16   A.  Yes.

17               MS. GUTIERREZ:  At this time, I would like to move

18   into evidence Plaintiffs' 5 as Mr. Balderas's direct testimony.

19               THE COURT:  Any objection?

20               MR. VISWANATHAN:  No objection.

21               THE COURT:  Let me just confirm, Mr. Balderas, that

22   this testimony that you have provided in this document you

23   continue to affirm is the truth, the whole truth, and nothing

24   but the truth, right?

25               THE WITNESS:  Yes.

1          THE COURT:  I will admit what has been marked for

2     identification as Plaintiffs' 5 into evidence as the direct

3     testimony of Mr. Balderas.

4          (Plaintiffs' Exhibit 5 received in evidence)

5          MS. GUTIERREZ:  Within Plaintiffs' 5, there is a

6     payroll sheet that is actually marked in your Honor's binder as

7     Exhibit 5.

8          THE COURT:  Behind tab 5.

9          MS. GUTIERREZ:  Behind tab 5, Exhibit 5.

10         THE COURT:  This is a three-page chart that indicates

11    at the top right the name Romulo, is that correct?

12         MS. GUTIERREZ:  Yes, that's correct.

13         The numbering of this exhibit will actually be

14    Plaintiffs' Exhibit 6.

15         THE COURT:  So I am marking this as Plaintiffs' 6 for

16    identification.  Again, this is what was submitted prior to

17    trial as tab 5, and it's a three-page chart that catches the

18    pay period, amount, and name, apparently, for Mr. Balderas.

19         Any objection, counsel?

20         MR. VISWANATHAN:  No objection.

21         THE COURT:  Plaintiffs' 6 is admitted.

22         (Plaintiffs' Exhibit 6 received in evidence)

23         MS. GUTIERREZ:  I have nothing further.

24         THE COURT:  Thank you.

25         Mr. Viswanathan, you may take the podium for

G4I8TAP2                    Balderas - cross

1   cross-examination.

2           MR. VISWANATHAN:  Thank you.

3   CROSS-EXAMINATION

4   BY MR. VISWANATHAN:

5   Q.  Good afternoon, Mr. Balderas.

6   A.  Good afternoon.

7   Q.  How are you?

8           How many years you have been living in New York City?

9   A.  10 years.

10  Q.  How old are you?

11  A.  38.

12  Q.  What do you do for a living?

13  A.  Doing deliveries.

14  Q.  Apart from doing deliveries, do you do any other work?

15          THE COURT:  Time period, counsel.

16  Q.  During the period of your employment with Brick Lane Curry

17  House, did you do any other work?

18  A.  Yes.  As a dishwasher in another state.

19          THE INTERPRETER:  Correction.

20  A.  No.  Here in New York.

21  Q.  Where did you work?

22  A.  That restaurant was closed in 2005.

23  Q.  During your entire time living in New York City, apart from

24  working as a deliverer, did you do any other work?

25          MS. GUTIERREZ:  Objection.

G4I8TAP2                           Balderas - cross

1   A.  No.

2           THE COURT:  Are you asking about at this restaurant or

3   at a different place of employment, because I realize the

4   question was ambiguous.

5           MR. VISWANATHAN:  Generally.

6           Generally, apart from working as a deliverer, does he

7   do anything else?

8           THE COURT:  So other than his employment at Brick Lane

9   Curry House, did he have any other employment at the same time?

10          MR. VISWANATHAN:  Yes.

11  A.  No.

12  Q.  Did you ever do repair work, bicycle repair?

13          MS. GUTIERREZ:  Objection.  Time frame.

14          THE COURT:  Sustained.

15  Q.  Did you do repair work during the time you worked with

16  Brick Lane Curry House?

17  A.  Only when I had a flat tire on my bike, I would repair it.

18  Q.  Did you do repairs for others?

19  A.  No.

20  Q.  When did you start working for Brick Lane Curry House?

21  A.  July 2013.

22  Q.  Until when you worked with Brick Lane Curry House?

23  A.  February 2014.

24  Q.  Typically, on average, how many deliveries you would make

25  when you were employed at Brick Lane Curry House?

G4I8TAP2                          Balderas - cross

 1              MS. GUTIERREZ:  Objection.

 2              THE COURT:  Sustained.  Rephrase.

 3   Q.  How many deliveries you made each day, approximately, with

 4   Brick Lane Curry House?

 5   A.  When it was busy, we will make from five to ten, even up to

 6   five to ten deliveries per day.

 7   Q.  Did you earn cash tips?

 8   A.  Every once in a while someone will give us 75 cents or a

 9   dollar as a tip.

10   Q.  So apart from the cash tips, the customers did add tips to

11   the credit card bill they paid, correct?

12   A.  Sometimes yes, sometimes no.

13   Q.  Did you sit with the manager every night to account for the

14   tips and collect your tips for that particular day?

15   A.  No.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

G4IAATAP3                    Balderas - Cross

1   BY MR. VISWANATHAN:

2   Q.  Do you know the name of the complaint you are filing in

3   this court against Brick Curry House?

4            THE COURT:  Do you know the what complaint?

5            MR. VISWANATHAN:  Do you know the complaint before

6   this Court in this action?

7            THE COURT:  You are asking if he's aware that a

8   lawsuit was filed in his name?

9            MR. VISWANATHAN:  Yes.

10            THE COURT:  And that brings us here?

11            MR. VISWANATHAN:  Yes.

12            THE COURT:  Do you have an objection to that question?

13            MS. GUTIERREZ:  That phrasing is good.

14            THE COURT:  All right.

15   A.  Yes.

16   Q.  So you've read the complaint against the Curry Lane House

17   which is before this Court today, correct?

18            THE COURT:  Are you asking if he read the legal

19   document captioned complaint that was filed in this action?

20            MR. VISWANATHAN:  Yes.

21            THE COURT:  Any objection?

22            MS. GUTIERREZ:  No objection.

23            THE COURT:  Go ahead.  Yes.

24   Q.  Have you seen the Exhibit Five in front of you, please?

25   A.  Yes.

1          THE COURT:  You're asking if he's seen the declaration

2    that he just attested to; is that what you're asking?

3          MR. VISWANATHAN:  Actually, I'm asking about Exhibit 6

4    which has been marked as -- may approach and handover what has

5    been marked as Exhibit 6, your Honor?

6          THE COURT:  You may.

7          (Pause)

8          MR. VISWANATHAN:  Judge, I was referring to the

9    payroll sheet record.

10          THE COURT:  OK.  That's been admitted as Plaintiff's

11   Six.

12          MR. VISWANATHAN:  Yes, judge.

13   Q.  Please have a look at the Exhibit 6 in front of you.

14          (Pause)

15   A.  OK.

16   Q.  You recognize your signature on that, correct?

17   A.  Yes.

18   Q.  Do you look at the amounts you received every week?

19          MS. GUTIERREZ:  Objection.

20          THE COURT:  Sustained.  I do not understand the

21   question.

22   Q.  Can you look at the amount which you have claimed as

23   received every week.  Are you able to see the amounts?

24   A.  Yes, I see.

25   Q.  Do you still claim that --

```
 1          MR. VISWANATHAN:  I'm sorry.  I'm going to rephrase

 2   that question.

 3          Do you still claim you have -- you're owed more money

 4   than what has been given to you?  Are you still owed more

 5   balance than what you already got?

 6          MS. GUTIERREZ:  Objection.

 7          THE COURT:  Are you asking him if he continues to

 8   believe that he is owed more money by his former employer than

 9   he was paid?

10          MR. VISWANATHAN:  Yes.

11   A.  Yes, of course.

12   Q.  Typically, everyday at work what time you started your

13   work?

14   A.  I would start typically about 10 to 11 in the morning and I

15   would work till around 11 o'clock every night.

16   Q.  How did you get -- I will rephrase.  Who gave you the

17   delivery order?

18   A.  The waiters will bring the order downstairs.

19   Q.  There will be a ticket printed on every packet, correct?

20   A.  Yes.

21   Q.  And it will be in English language, correct?  It will be in

22   English language?

23   A.  Yes, it was in English.

24   Q.  So you would be able to read English, understand address

25   and deliver it properly, correct?
```

1    A.  No, I don't read English.  I just take the delivery and I

2    went to the address they told me.

3    Q.  So you don't read the ticket?

4    A.  No.

5            MS. GUTIERREZ:  Objection.

6            THE COURT:  Sustained.  I have to -- what he said was

7    he read the address and he went to the address.  I don't want

8    to get into a long conversation about whether that's reading

9    English or not.  We're just going to get to it, counsel.

10   Q.  When you reach the address where the packet has to be

11   delivered you had to call the customer to come and pick up the

12   packet, correct?

13   A.  No.  We take the package to the apartment or the place

14   where the customer lives.

15   Q.  But when you reach the building you had to call the

16   customer to let you into the building or you had to ask the

17   customer to come and pick up the packet?

18   A.  No.  Typically, we would give the tickets to the doorman

19   because usually they don't let us go into the elevator.

20   Q.  Then will you collect the --

21           MS. GUTIERREZ:  Objection.

22           MR. VISWANATHAN:  I will rephrase, your Honor.

23           THE COURT:  OK.

24   Q.  You accept that some deliveries are not already paid?

25   A.  OK.  But since there were several delivery boys we don't

1   know precisely who always asked what.

2   Q.  Did you ever collect cash from the customers when you

3   delivered the packets?

4   A.  Yes.  Every once in a while when we may get payment for ten

5   or $11 and we take the money to the cashier.

6   Q.  My question was different.  If the customer has not paid

7   for the order you will still deliver the packet to the doorman?

8   A.  No.

9   Q.  What will you do in those cases?

10  A.  That case we wait downstairs with the package for the

11  client or the doorman to bring down the money and then I will

12  give him the package.

13  Q.  For that purpose you have to communicate with the customer

14  to come down with the money, correct?

15          MS. GUTIERREZ:  Objection.

16          THE COURT:  I'll allow it.  Just noted, counsel, this

17  feels like a very long winded way to the get to the answer.

18  Anyone who's ever had delivery service in new York frequently

19  gets delivery service from people who do not speak English.

20  It's certainly something one can struggle through.  If you're

21  trying to ask about his English language skills ask him about

22  his English language skills.  Just ask the question.

23  Q.  Do you speak at least some English?

24  A.  Yes, I understand a little and I speak a little.

25  Q.  On Exhibit Five on page two -- in Exhibit Five on page two

G4IAATAP3                     Balderas - Cross

1   paragraph nine the question is, you stated that you understood

2   the contents of this particular page, correct?

3   A.   A little bit.

4   Q.   Paragraph nine says the activities that you carried out.

5   Do you stand by what has been stated in paragraph nine on page

6   two of Exhibit Five?

7   A.   Yes.

8   Q.   You don't need to correct any statement on that, correct?

9             MS. GUTIERREZ:  Objection.  He doesn't -- we don't

10  know if he reads English, so --

11            THE COURT:  Two things.  You could have done a Spanish

12  language version and then submitted in quotation.  That would

13  have made this process more smooth.  But there's been no

14  objection to the declarations which state on the face and

15  repeated here again were translated in English before signing

16  it.  So I feel comfortable that the witness assuming that

17  testimony is accurate and understood it before he signed it.

18  But if you want to ask him a specific question since it's in

19  English let's have the interpreter translate the paragraph and

20  then ask your question.  OK?

21            MR. VISWANATHAN:  Sorry, your Honor.  I just did not

22  want to waste the court's time.

23            THE COURT:  I appreciate that but it's also wasting

24  the time to say do you stand by everything and then you're

25  going to focus on a particular word.  So this all about truth

1    seeking.  If there is something you want to point his attention

2    to say, do you see where it says whatever you want, have the

3    translator read it to him in Spanish.  No game playing, no

4    circling around it.  Just let's get to it, counselor, OK?

5              MR. VISWANATHAN:  Yes.  Thank you.

6    BY THE COURT:

7    Q.  Paragraph nine on page two of Exhibit Five, the last two

8    three lines carrying -- and bringing up food and other items

9    from the basement for the kitchen staff and washing the

10   sidewalk.

11   A.  Yes.

12   Q.  So is that correct statement?

13   A.  Yes.

14   Q.  Paragraph 12 says of the same Exhibit Five page number two,

15   I will read it.  My work responsibilities involved handing

16   goods that traveled in interstate commerce everyday such as

17   food and soda that were brought from outside New York state.

18   Do you read that please?

19              (Pause)

20   A.  I don't recall this one.

21   Q.  You don't recall?

22   A.  No.

23              THE COURT:  Let me ask that sentence then is that, do

24   you have any knowledge of what's stated in that sentence?

25              THE WITNESS:  Not very much.

1          THE COURT:  When you say "not very much" do you have

2     any knowledge of the information that's contained in that

3     sentence?

4          THE WITNESS:  Well, on occasions they were bringing

5     things and sometimes they didn't.

6          THE COURT:  OK.

7     Q.  But the question was, how do you know that they were

8     involved in interstate commerce?  If I may ask the question,

9     your Honor?

10          THE COURT:  That wasn't -- the question now is the

11     question and you may ask it.

12     Q.  How do you know that the goods that you handled traveled in

13     interstate commerce?

14     A.  I don't have any idea.

15     Q.  Now, you have looked at Exhibit 6 and you have acknowledged

16     for this Court that you received the amounts which are

17     specified there?

18          MS. GUTIERREZ:  Objection.

19          MR. VISWANATHAN:  I will not complicate my question.

20          THE COURT:  I don't know what the question is.

21          MR. VISWANATHAN:  I'm coming from the question.

22          THE COURT:  You were testifying and it had nothing to

23     do with what the witness had testified.

24          MR. VISWANATHAN:  I will ask the question any way.

25     Did you ever complain to the manager or anyone at the

G4IAATAP3                    Balderas - Cross

1   restaurant that you were not being paid minimum wages and that

2   overtime wages as you claim?

3   A.  No, because at the end of the week they will pay me.

4   Q.  I'm sorry.  I didn't hear.

5          THE INTERPRETER:  The interpreter will repeat.

6   A.  No, because at the end of the week I will be paid.

7   Q.  But did he ever complain to anyone that had been paid by

8   anyone who was the deal to you?

9          MS. GUTIERREZ:  OK.

10         THE COURT:  Grounds?

11         MS. GUTIERREZ:  Asked and answered.

12         THE COURT:  I think it was may have been confusing in

13  giving the response so you may answer.  Do you need the

14  question again?

15         THE INTERPRETER:  Yes, your Honor.

16  Q.  Did you ever complain to anyone --

17         THE COURT:  Did you ever complain to anyone?

18  Q.  -- that you did not get what was due to you?

19  A.  In reality you can complain.  You are told how much you are

20  going to make a week and you receive that amount in a week.

21  Q.  Isn't it true that everyday you sat with the manager and

22  accounted for the tips and got your tips in cash?

23         MS. GUTIERREZ:  OK.

24         THE COURT:  Grounds?

25         MS. GUTIERREZ:  Asked and answered.

G4IAATAP3                    Balderas - Cross

1         THE COURT:  Sustained.

2   Q.  Isn't it true that you only worked for five days a week?

3   A.  Well, no.  I started working six days per week and in the

4   month of September I worked seven days per week.

5   Q.  The number of hours you're claimed in the complaint and in

6   the trial preparation is incorrect?  You're claiming much more

7   than what you actually worked?

8         MS. GUTIERREZ:  Objection.

9         THE COURT:  Sustained.

10  Q.  When did you meet your attorneys?  In which month and the

11  year did you meet the attorneys who are representing you in

12  this legal action before this Court?

13  A.  October 2014.

14  Q.  Who, specifically, you met at the attorneys office?

15        MS. GUTIERREZ:  OK.

16        THE COURT:  Well, grounds?

17        MS. GUTIERREZ:  I don't know that it's relevant to the

18  underlying claims.  It's starting to go to issues of

19  confidentiality.

20        THE COURT:  What's the relevance of when he met the

21  attorneys here or something else?  Do you want to know when he

22  met the attorneys here?

23        MR. VISWANATHAN:  Yes.

24        THE COURT:  OK.  I'll take it for what it's worth but

25  we'll move on.

1          When did you met the two attorneys that are sitting

2     here representing you here today?

3          THE WITNESS:  As I told you, in October 2014.

4     Q.  Did somebody take you to the attorneys' office?

5          THE COURT:  What is the relevance, counsel?  If you

6     can articulate it I'll be happy to allow it.

7          MR. VISWANATHAN:  One question about that, your Honor,

8     if I may?

9          THE COURT:  Can you just articulate relevance?

10          MR. VISWANATHAN:  I just want to know who was being

11     responsible for him driving in this action.

12          THE COURT:  Why does that matter which is another way

13     of saying what's relevance?  Go ahead.  If you can state the

14     relevance, if you can't then I'm sustaining the objection.

15          MR. VISWANATHAN:  It's a general inquiry.

16          THE COURT:  So it's an irrelevant inquiry?

17          MR. VISWANATHAN:  Not irrelevant but just limited.

18     I'm not pressing on the part.

19          THE COURT:  OK.

20          MR. VISWANATHAN:  I have no further questions at this

21     time.

22          THE COURT:  Thank you.

23          Counsel?

24          MS. GUTIERREZ:  I'm sorry, your Honor.

25          THE COURT:  Briefly.

1          (Pause)

2              MS. GUTIERREZ:  Nothing further, your Honor.

3              THE COURT:  Thank you.  You may step down.  You're

4      excused.

5              Ms. Gutierrez.

6              MS. GUTIERREZ:  The plaintiffs rest.

7              THE COURT:  All right.  Mr. Viswanathan, anything

8      before we turn to the defendant's case?

9              MR. VISWANATHAN:  Nothing else.

10             THE COURT:  No motions.  OK.  You may call your first

11     witness.

12             MR. VISWANATHAN:  I'm calling the defendant Satinder

13     Sharma.

14             THE COURT:  OK.  Mr. Sharma, you may step forward.

15      SATINDER SHARMA,

16         called as a witness by the Defendants,

17         having been duly sworn, testified as follows:

18     DIRECT EXAMINATION

19             MR. VISWANATHAN:  Your Honor, I would respectfully

20     request the Court to allow me to conduct the

21     direct-examination?

22             MS. GUTIERREZ:  No, objection.

23             THE COURT:  Here is the difficulty, Mr. Viswanathan,

24     you've asked this previously and the problem is I set up a

25     procedure.  There's no mystery as to what it was.  When you

G4IAATAP3                        Sharma - Direct

1    came into the case which was on the eve of trial because your

2    predecessor counsel left the case, didn't show up I think for

3    the final pretrial conference, you came into the case and you

4    asked for an adjournment and an extension and a time to submit

5    materials.  You didn't object to the process of submitting

6    direct testimony by declaration and I gave you that time over,

7    if I'm remembering correctly, over plaintiff's counsel's

8    objection because there had been so much delay.  Is that

9    correct, Mr. Viswanathan?

10            MR. VISWANATHAN:  I think that's correct, your Honor.

11            THE COURT:  I gave you time to put in materials and

12   you didn't in a timely fashion.  The deadline again was

13   ignored.  I extended it again.  And as we discussed last time

14   you did late but, apparently, I received it the day after it

15   was due, asked for a further extension after the deadline had

16   passed and so at our final pretrial conference you asked again

17   to throw out the process that had been in place for years, that

18   you didn't object to when you came into the case and submit

19   testimony even though you had in your possession all of the

20   plaintiff's testimony and that just, I don't understand how

21   that can be fair.  How can that be fair?  And that's,

22   essentially, what you are trying to do now, right?  Again,

23   asking the same thing or am I misunderstanding?

24            MR. VISWANATHAN:  Your Honor, you have stated very

25   correctly, your Honor.

G4IAATAP3                          Sharma - Direct

1           THE COURT:  Let me just say, it's OK that you are

2     asking it again.  I want to know if there's a different basis

3     for which you are asking so that I can understand if there's

4     something else I should consider and if there is I will

5     consider.

6           MR. VISWANATHAN:  If I may, yes, your Honor.  I do not

7     want to risk if, that is the requirement by defense counsel

8     then I understand that the procedure.  I totally understand.

9     And there are other reasons since I appeared before your kind

10    your Honor in the month of January when it was supposed to

11    have, the trial was supposed to come in from that day.  I

12    understand, your Honor, after that almost like two months I had

13    been sick, number one.

14          And number two --

15          THE COURT:  Let me ask you this.  You were too sick to

16    put in a letter asking for an adjournment?  To just within a

17    deadline tell me that you were sick cause I didn't hear about

18    that till after the deadline, right?

19          MR. VISWANATHAN:  Yes, your Honor.

20          THE COURT:  Were you hospitalized?

21          MR. VISWANATHAN:  I will explain, your Honor.  Your

22    Honor, the two months before March 28, the time I was totally

23    immobile and and the fact that I'm in the middle of many other

24    matters which I did have to adjourn a few of them and this

25    matter came to me because I had to take up this matter because

1  the matter to help out the client here.  And I'm not claiming

2  that I did anything kind of favor to the Court but on my part I

3  took this case so as help out a client who was in dire

4  necessary since the trial date was already fixed and --

5           THE COURT:  The trial date was fixed and you asked me

6  to move it and I moved it.

7           MR. VISWANATHAN:  Yes, I totally, your Honor.

8  Presently, I will try to articulate my requests for a limited

9  examination, direct-examination in view of the statements which

10  have come from the plaintiffs today at the trial during the

11  cross-examination.  I just want to clarify a few practical

12  parts.

13           THE COURT:  How many questions do you have?

14           MR. VISWANATHAN:  I will be able to conduct them very

15  fast.

16           THE COURT:  I asked how many questions do you have

17  that you've just proffered to this Court of law came to you

18  only because of statements offered in cross-examination to you.

19  That's what you just said to me and I do not want to be misled

20  by counsel appearing before me.  So the truth is what we're

21  after here and that's what your ethical obligations are.  As I

22  say, I'm open to persuasion.  So what you said is matters came

23  out at cross-examination that could not have been anticipated

24  essentially and you've got some questions.  How many questions

25  is it?

G4IAATAP3                        Sharma - Direct

1          MR. VISWANATHAN:  It's about 34, 35 I have here with

2     me.

3          THE COURT:  I'm sorry, counsel.  I cannot think you

4     are being candid with me and let me say that's troubling.  OK?

5     It's troubling if you are not being honest with the Court.

6     What you are trying to do I think is fib so that you can

7     circumvent the process I've put in place and that hasn't been

8     objected to.  You just told me.  That's my impression.

9          MR. VISWANATHAN:  If I may clarify, your Honor?

10          THE COURT:  Please.

11          MR. VISWANATHAN:  From the plaintiffs' declaration

12     which I have been doing as the Court correctly termed it before

13     the plaintiffs' declaration sought with a different answer

14     already, in fact, they were available since December.

15     Actually, the date was changed and the same declarations were

16     made available.  But as the Court pointed out last time to me,

17     those declarations that are from my clients.  I have the

18     benefit -- that's what the Court told me -- that I have the

19     benefits of plaintiffs' papers, declarations conclusions of law

20     etc.

21          The plaintiff's declaration which was explored today

22     only in the cross-examination, I did not have an opportunity to

23     put to explain.  So the Court other words it is in the interest

24     of the case and in the interest of justice I'm requesting the

25     Court because this testimony, his testimony would be unheard by

1    your kind your Honor.  I'm hoping that I'm quite confident that

2    my client is quite informative will speak clearly and it will

3    be a very quick process.

4              THE COURT:  Counsel, go ahead.

5              MS. GUTIERREZ:  Sorry.  I have to vehemently object to

6    this.  He's had my client's declaration for four months.  It

7    would be completely against the interests of justice to just

8    allow his client to walk in here and testify without giving me

9    any type of idea of what's expected.  There is nothing that

10   came up during my client's cross that should have been a

11   surprise at all.  There was nothing unusual, no unusual issues

12   of law or fact as far as FLSA cases go that came up during the

13   cross.  In fact, I don't know if Mr. Viswanathan is aware that

14   you actually are allowing him to enter his client's prior

15   affidavit as his testimony, that I have prepared for and that

16   is what we agreed to at the prior, at the final pretrial

17   conference.  I think allowing him to just come in here and have

18   direct testimony would pretty much fly in the face of every

19   order that's been issued in this trial until today.

20             MR. VISWANATHAN:  There are two points I want to make,

21   your Honor.  There is the deposition, the deposition of

22   Mr. Sharma.

23             THE COURT:  OK.  I'm going to cut this off.  I set up

24   a process.  Throughout the process I have been open to

25   objection.  I have been open to requests for alteration, for

1   extensions.  I did all of that.  And again, when you came into

2   the case over plaintiff's objection I moved the trial date,

3   right?  Am I misremembering that?

4          MS. GUTIERREZ:  No.  That's correct.

5          THE COURT:  Everybody agrees.  Everybody is shaking

6   their heads.  I gave you a chance even though the deadline has

7   passed to put in materials including direct testimony by

8   declaration; is that right?

9          MR. VISWANATHAN:  Yes.

10         THE COURT:  And there was no objection at that point

11  voiced to the process by which I was taking direct testimony,

12  correct?

13         MR. VISWANATHAN:  Yes, your Honor.

14         THE COURT:  But you had an opportunity to do that,

15  yes?  Because months have passed since then.  So the Court's

16  word has to mean something.  The Court's orders have to mean

17  something.  Sometimes people object to a process.  They make

18  their objection.  I modify it if I think something's unfair but

19  what I cannot allow, I'm sorry, I just can't allow it.  It's

20  just simply unfair to change course, here we are at trial,

21  after all already essentially allowing that to happen.  I did

22  already allow that once in this case which is more than most

23  judges would do.  I on the eve of trial when defense counsel

24  disappeared and knew counsel came in even though the process

25  had already played out, I allowed a new deadline to be set for

G4IAATAP3                      Sharma – Direct

1    materials to be submitted, I allowed a new trial date.  Those

2    deadlines were missed.  This is the trial date.

3           You may seek to admit the direct and since there had

4    been no objection to that process, you may seek to admit the

5    testimony, the declaration of Mr. Sharma's direct testimony as

6    his direct testimony in accordance with my un-objected to rules

7    and procedures that I have been clear about in this case.  So

8    you may do that.  Would you like to do that?

9           MR. VISWANATHAN:  I would like one a very limited

10   request I'm making.  Whatever the issues that came up today in

11   the plaintiff's cross-examination a few questions.  I

12   understand --

13          THE COURT:  So would you like to admit Mr. Sharma's --

14   do you have a copy in front of you, Mr. Sharma?

15          THE WITNESS:  No, I don't.

16          THE COURT:  Would you put a copy of his declaration in

17   front of him, Mr. Viswanathan.

18          (Pause)

19          THE COURT:  Is it marked as defendant's --

20          MR. VISWANATHAN:  One.

21          THE COURT:  OK.

22          MR. VISWANATHAN:  If the Court wants the Defendant's

23   A.

24          THE COURT:  Let's do Defendant's A.  Thank you.

25          (Pause)

1          THE COURT:  It's marked as Defendant's A.

2          (Pause)

3          THE COURT:  Do you have that in front of you,

4    Mr. Sharma?

5          THE WITNESS:  Yes, I do.

6          THE COURT:  It's a declaration dated December 7, 2015

7    and is that your signature on the third page?

8          THE WITNESS:  This one doesn't have it but, yes, I

9    know I signed it.

10          THE COURT:  Is there anything inaccurate or any errors

11    in this testimony that you went to bring to my attention before

12    it's moved as your direct testimony?

13          THE WITNESS:  No, your Honor.

14          THE COURT:  Do you continue to swear or affirm that

15    the testimony that is contained in this declaration is the

16    truth, the whole truth and nothing but the truth?

17          THE WITNESS:  Yes, your Honor.

18          THE COURT:  Do you seek its admission as his direct

19    testimony?

20          MR. VISWANATHAN:  I seek your Honor's permission.

21          THE COURT:  Any objection?

22          MS. GUTIERREZ:  I just want to point out I do have an

23    objection as to some of the content as it does appear to be

24    hearsay.  Specifically, in paragraph 15 it starts off,

25    according to the time sheets the plaintiffs countersigned for

1       the payment that they received for the amount of work

2       performed.  It does not sound like he has any personal

3       knowledge.  It's simply according to the time sheets.

4                  THE COURT:  So you have a hearsay objection to the

5       paragraph 15?

6                  MS. GUTIERREZ:  Yes.

7                  THE COURT:  Any other paragraphs?

8                  MS. GUTIERREZ:  Below that, paragraph 16 before

9       signing and receiving the payments as per my manager/chef the

10      plaintiffs agreed to the amount that also appears to be hearsay

11      as per the manager/chef.

12                 THE COURT:  Any others?

13                 MS. GUTIERREZ:  That's it.

14                 THE COURT:  Any response to the hearsay objection,

15      paragraphs 15 and 16?

16                 MR. VISWANATHAN:  Your Honor, the defendant entered a

17      different -- that he was not in charge of the operations of the

18      particular location Brick Lane Curry House.  He only visited

19      twice or three times a week or two weeks.  And each time it was

20      for about 30 minutes.  This time by that statement he will

21      stand by that statement.

22                 THE COURT:  Do you have any response to the hearsay

23      objection on paragraph 15 or 16?

24                 MR. VISWANATHAN:  This is the first of my knowledge he

25      obtained from the manager in charge.

1        THE COURT:  All right.  Well, I will take it for what

2   it may permissibly be considered for and any other objections,

3   counsel.

4        MS. GUTIERREZ:  Nothing else.

5        THE COURT:  All right.  Then those noted objections

6   and my caveat and I'll take for whatever it may permissibly be

7   considered for and I will admit Defendant's A as direct

8   testimony of Mr. Sharma.

9        Anything else to move into evidence?

10       MR. VISWANATHAN:  If the Court were -- I do not know

11  why I'm going to ask how the Court is going to take my request.

12  They did a deposition, the counsels conducted of Mr. Sharma is

13  that, maybe I can request the Court to take that record.

14       THE COURT:  Ms. Gutierrez.

15       MS. GUTIERREZ:  No, your Honor.  We submitted a joint

16  pretrial order which addressed whether or not defense counsel

17  wanted to submit any portion of the deposition testimony and

18  direct testimony and nothing was indicated there.  The

19  opportunity to present anything to the Court has passed and I

20  see no reason why it should be allowed in at this late stage

21  without any more explanation as to its necessity.  We have an

22  affidavit submitted by Mr. Sharma as his direct testimony and

23  now I'm having an opportunity to cross examine him.

24       THE COURT:  Sustained.  Anything else, counsel?

25       MR. VISWANATHAN:  This morning a few issues came up.

1    It's not many.  I don't have many questions.  There are very

2    important, very much very basic allegations in this complaint.

3          THE COURT:  So, counsel, I'm trying to remain patient.

4    That nothing was done in the case really before now I

5    understand makes the position you're in difficult.  But

6    maintaining fairness and order is my job.  And what you've just

7    said is that there are basic issues which means there was no

8    surprise and they could have been dealt with all along and they

9    weren't until now and it's just not fair.

10         MR. VISWANATHAN:  I misspoke, your Honor.  If I may

11   correct myself?  You already seen the point and I am trying to

12   make it.  The defendants that testified to certain facts -- and

13   your Honor was in fact wondering as to I'm asking those

14   questions, just two or three issues.  If I can clarify, the

15   defendant's, the question of that, particularly, I will tell

16   you briefly.  I just want to have explanation of the defendant

17   that will be the one question I have.  I just want to establish

18   the defendant's version that is absolutely not true.

19         THE COURT:  This is just a process point that there

20   was a process un-objected to and extended over plaintiff's

21   objection for you to put in the defendant's testimony and you

22   didn't do it.  So I will not change the rules in a way that

23   prejudices one side.  That is what you're asking me to do and I

24   won't do it.  I set up rules.  I listened to objections or

25   concerns to the point that I gave you significant additional

G4IAATAP3                           Sharma - Direct

1     time over plaintiff's objections to put in the defendant's side

2     and this is what I have now and I won't allow you to circumvent

3     those rules in a way that's prejudicial to the other side.

4          MR. VISWANATHAN:  Your Honor, because you have -- and

5     because of the my repeatedly asking, I'm just seeking begging

6     your kind your Honor for doing that.  First of all, I just came

7     in.  I was a new attorney and as I said, this is not something

8     I'm doing for the Court but I did it definitely for the

9     clients.  The client has nothing to do with that, I understand,

10    your Honor.  But I'm not are regular practitioner.  I'm a

11    regular and the last two months that my work was cut out

12    because of the medical issue.

13         THE COURT:  Again, counselor, I'm sorry to hear that.

14    If I had heard that before -- let me just, you were able, you

15    were physically able to put in a letter indicating your medical

16    issues, right?  I mean you weren't in a coma.  You weren't --

17    I'm sorry.  It's a bit of "the dog ate my homework" moment, the

18    number of excuses, the delay, the repeated attempts at

19    circumvention and I'm sorry if what you're saying is that you

20    had health issues but we've got to -- I promised when I granted

21    the extension over plaintiff's counsel that we would proceed to

22    trial and I gave you every opportunity to do more and it wasn't

23    done and so we're done.  It's not fair.  And that this is not

24    what you regularly do.  This is not the kind of case that you

25    normally handle.  It doesn't excuse the fact that as an

SATINDER SHARMA                 Sharma - Cross

1    attorney for the Court you still have to follow the Court's

2    rules.

3              MR. VISWANATHAN:  I want to submit something.  I

4    didn't want to submit something and I had to --

5              THE COURT:  Counsel, I'm sorry, counsel.  The more you

6    talk the more the story changes and it's getting worse, not

7    better in terms of my patience for it.  Again, if you were ill,

8    I'm sorry to hear that, but as the Court I frequently hear

9    requests from counsel for adjournments and if there are medical

10   matters you wanted to put in front of me, confidentially there

11   was a process in place do that.  None of that happened.

12   Nothing happened.  Nothing happened.  And so we're at trial.

13   It's time to move on.  Thank you.

14             Any cross-examination?

15             MS. GUTIERREZ:  Yes.

16   CROSS-EXAMINATION

17   BY MS. GUTIERREZ:

18   Q.  Good afternoon, Mr. Sharma.

19   A.  Good afternoon, Ms. Gutierrez.

20   Q.  You testified that you are part owner of Brick Lane Curry

21   House.  Ajit Bains is the other owner, correct?

22   A.  Yes, that's correct.

23   Q.  And you are 50/50 shareholders, correct?

24   A.  Yes, that's correct.

25             THE COURT:  Sir, if you could pull the microphone down

SATINDER SHARMA                    Sharma - Cross

 1  and let counsel finish the question and answer for clarity of

 2  the record.

 3  Q.  Now as part owner you testified that you are in charge of

 4  the general management of the restaurant.  That's at paragraph

 5  six of the declaration; is that correct?

 6  A.  Yes, that's correct.

 7  Q.  And that work includes supervising and advising the other

 8  managers and staff, correct?

 9  A.  I would like to -- could you rephrase that please?

10  Q.  And that as a general manager that includes supervising and

11  advising the other managers and staff at that location?

12  A.  Technically, not.

13         MR. VISWANATHAN:  Objection.  The word is "general

14  management" and there is a difference between "general

15  management" and "general manager".

16         THE COURT:  OK.  You may rephrase, counsel.

17  Q.  Does your work as a general manager include supervising and

18  managing the floor managers and staff?

19         MR. VISWANATHAN:  Objection.

20         THE COURT:  The testimony was that his work includes

21  general managing.  So you've rephrased that to "general

22  manager".  I'll sustain the objection.

23  Q.  OK.  Part of your duties within general managing of the

24  restaurant includes supervising floor managers and staff,

25  correct?

SATINDER SHARMA                 Sharma - Cross

1    A.  No.

2    Q.  Sorry?

3    A.  No.

4    Q.  At paragraph five of your declaration you state, during my

5    visit I walked through the restaurant and answer any questions

6    the team leader or chef may have, correct?

7    A.  Yes, that's correct.

8    Q.  So you are an authority on certain questions and issues at

9    the restaurant, correct?

10   A.  Yes, being one of the owners if there is a question they

11   have, I am and I answer.  The chef want's to ask me about a

12   certain recipe, I'm the one he would ask because I'm a chef.  I

13   started out as a chef.  I opened Brick Lane as a chef.  I used

14   to cook myself when I started.  Before I was given an incentive

15   and sort of making an owner of Brick Lane.  So that's the

16   reason the background behind that is if there's a specific

17   question that a chef or manager might have for me, they put it

18   to me and I don't micromanage them.  I do not interfere in

19   their affairs.

20   Q.  But there are certain issues that only you can resolve as

21   the owner, correct?

22   A.  It depends on what they are.

23   Q.  There are certain issues that only you -- they have

24   questions only you can answer them, correct?

25   A.  Could you rephrase?

1             MR. VISWANATHAN:  Objection.

2             THE COURT:  Can you rephrase, counsel?

3             MS. GUTIERREZ:  Yes.

4    Q.  But ultimately because they come to you with certain

5    questions only you can answer them, correct?

6    A.  I could be one of the people who could answer them, yes.

7    Q.  As part of the general management of the restaurant when

8    you opened the restaurant you hired the floor manager, Derauj

9    Tuwari, correct?

10   A.  No, I did not.

11   Q.  I'm going to hand you your deposition.

12             MS. GUTIERREZ:  Your Honor, would you like a copy?

13             THE COURT:  Yes.

14             (Pause)

15             THE COURT:  Do you have that, counsel?

16             MR. VISWANATHAN:  I have it.

17             THE COURT:  Why am I looking --

18             MS. GUTIERREZ:  If you could turn to page 36,

19   beginning with line two.

20   Q.  Mr. Sharma, do you recall being deposed?

21             THE COURT:  Just a second.  I assume you are seeking

22   to impeach based on the prior inconsistent statement, so I want

23   to see based on the question that was asked what part of the

24   testimony you are directing.

25             MS. GUTIERREZ:  Understood.

SATINDER SHARMA              Sharma - Cross

1          THE COURT:  So what lines?

2          MS. GUTIERREZ:  Lines two through 16.

3          MR. VISWANATHAN:  Page number threes.

4          MS. GUTIERREZ:  36.

5          (Pause)

6          THE COURT:  What is the "E" that's referenced here?

7          MS. GUTIERREZ:  DJ, Derauj Tuwari.

8          THE COURT:  Who is that?

9          MS. GUTIERREZ:  Line nine says DJ but prior to that

10  there's several pages that refer to him, so.

11          THE COURT:  What do you want to ask?

12          MS. GUTIERREZ:  I just want to clarify whether you

13  hired Derauj Tuwari to be a manager and he said he did not.

14          THE COURT:  OK.  Go ahead.

15  Q.  Do you recall being deposed on August 26, 2015?

16  A.  Yes, I did.

17  Q.  Do you recall taking an oath to tell the truth?

18  A.  Yes, I do.

19          MS. GUTIERREZ:  Looking at page 36 starting at line

20  two of your deposition transcript that you have in front of

21  you, I'm just going to read from there.

22  "Q.  You and Ajit as the owners decided you would be the

23  managers; is that fair characterization?

24  A.  Yes.  You could say that that's a fair characterization.

25  Q.  Did you discuss with him at that time what his pay would

SATINDER SHARMA                 Sharma - Cross

1  be?

2  A.  With DJ?

3  "Q.  Yes.

4  A.  Yes.

5  Q.  So you told them he would be the manager and you told him

6  what he would be paid in the compensation for that job?

7  "A.  No.

8  Q.  Essentially, you hired DJ to be the manager at the

9  restaurant, correct?

10  A.  Let me clarify this part.  One second.

11  Q.  It's a yes or no question.

12         THE COURT:  Go ahead.  You may clarify.

13  A.  When you had asked me that this question you asked me a

14  clear question I'll give you a clear answer.  As owners you

15  asked me, you know, who's going to be manager of your

16  restaurant?  Will it be DJ?  I said "yes".  Did you know what

17  DJ was going to be paid?  I said "yes".  Who hired DJ?  I've

18  given the name of the person.  The person is Vivek Deora.  He

19  was the GM of the group at the time.  As I had mentioned in my

20  testimony, DJ came in through references.  That was the person

21  who actually brought in DJ.  That was the person who hired.

22  You asked me if I had a conversation with him.  Absolutely I

23  did.  I also clarified who was the person who hired.  Does that

24  clarify your question?

25  Q.  Does DJ have ownership in Third Avenue?

SATINDER SHARMA                Sharma - Cross

1   A.  At this time, no.

2   Q.  Did he ever?

3   A.  There was a time it was in talks but not right now.

4   Q.  So never?

5   A.  As I said, there was a time it was part of the conversation

6   but --

7            THE COURT:  I'll direct the witness to answer the

8   question.  You've answered clearly that he doesn't now but was

9   there a time that he had ownership in the entity?

10           THE WITNESS:  Vivek the owner manager, was having a

11  different pay packet.  So, yes, he was part of the restaurant

12  before he split.  He was part of the group.  He was the man who

13  which to actually run the show completely because I had the

14  food.  So he was a man who was brought in run the overall

15  operation after the group.  The incentives that were given to

16  him were also certain -- and the business but then it did not

17  work out and he moved on.  So if there's an answer.

18  Q.  So he never had a percentage, a shareholder percentage in

19  the business?

20           MR. VISWANATHAN:  Objection, your Honor, already asked

21  and answered.

22           THE COURT:  Overruled.  Did he have a shareholder

23  percentage in the business?

24           THE WITNESS:  166 Third Avenue right now, no.

25           THE COURT:  And, yes, there was a time he did or there

SATINDER SHARMA                Sharma - Cross

1   was a time he was in discussion and it didn't come to tuition

2   or something or you don't know?

3          THE WITNESS:  I don't know how to specifically answer.

4   I don't want to say anything that I'm not clear about or giving

5   a vague answer, yes.  There were discussions.  There were also

6   incentives.  There were also a lot more than this being the tip

7   of the iceberg.  So I'm not sure how to refresh the specific

8   question.  That's, yes, he was a critical man.  He was the one

9   who was busy initially.  He was the one who used to do a lot

10  more.  He was with us quite a few year before he moved on.

11  That is in a way we stand clear.  If he would have still been

12  around he would have probably the one --

13  Q.  But at the time you hired DJ Mr. Vivek was not a

14  shareholder?

15  A.  I did not hire Vivek.

16  Q.  So at the time that DJ started working there --

17  A.  DJ was working for us before 166 Third Avenue.

18  Q.  Let me finish the question.  At the time that DJ became the

19  floor manager at Brick Lane Curry House Mr. Vivek was not a

20  shareholder at Brick Curry House, correct?

21  A.  I could say, yes, he was at the time.

22  Q.  OK.  I'm going to look at lines four through 14.

23         THE COURT:  Go ahead.

24         MS. GUTIERREZ:  It says:

25  Q.  At the Brick Lane Curry House you mentioned that were are

SATINDER SHARMA                Sharma - Cross

1  an owner; is that correct?

2  A.  Yes, part owner.

3  Q.  Who are the other owners?

4  A.  Ajit Bains.

5  Q.  Is there any other owner?

6  A.  Not at this time.

7  Q.  Just the two of you are co-owners?

8  A.  Yes.

9         THE WITNESS:  I said not at this time.

10 Q.  When was Vivek a part owner and what was his shareholder

11 percentage?

12        MR. VISWANATHAN:  Objection, your Honor.  Who is the

13 "he"?

14 A.  Deora, D-E-O-R-A.

15        THE COURT:  So the question is when was Vivek Deora a

16 shareholder?

17        MS. GUTIERREZ:  Yes.

18        THE COURT:  Go ahead.

19 A.  I don't remember the exact dates but he was in order to --

20 the place when we opened up in 2012.  Just after that, I

21 believe just after that he left since there were --

22        MS. GUTIERREZ:  I'm sorry.

23 A.  Business involved.  The reason why it's a different

24 question is for me to answer to since there were multiple

25 services businesses and the structure of the deal with him was

SATINDER SHARMA                  Sharma - Cross

1   quite complicated.  It was not as simple as we me to say.

2   Q.  What was his percentage stake in the business?

3   A.  As I said it was a quite complicated business.  So just to

4   clarify, it was a far more complex understanding with him

5   than --

6   Q.  OK.  But ultimately, back on page 36 just referring to that

7   you did end up telling DJ that he would be the manager and what

8   he would get paid for in for that position.

9   A.  I didn't have a discussion with DJ about what he makes.

10  Q.  You were telling the truth when you gave your deposition

11  testimony, correct?

12  A.  Yes, I did.

13          THE COURT:  Mr. Sharma, just asking you again, it's

14  challenging in here.  So please keep your voice up.

15  Q.  So you testified in your affidavit?

16  A.  Which page?

17  Q.  Your affidavit Defendant's A, paragraph 23 testified in

18  your restaurant business and in your experience as a rest owner

19  and chef no employee works 75 hours a week.  But you don't have

20  any personal knowledge as to the specific hours of the

21  plaintiffs in this case, correct?

22  A.  The reason why my attorney's was trying to say we'd like to

23  bring another witness is because DJ to leave the country for

24  visa issues.  The reason I'm giving this background is because

25  I did travel to Toronto to ask extensively as to how these

SATINDER SHARMA                Sharma – Cross

specific plaintiffs were paid and what's going on with these

people just so I know about these people before I came in.  As

a again statement that I gave and I told you I'm a chef myself.

I understand and where it's physically impossible and my

restaurants because I'm from that side of the table and I do

strongly believe that holding these values, one.

          Two,

Q.  I'd just like you to answer the question.  You don't have

any personal knowledge irrespective of the conversation that

you had with DJ, you don't have any personal knowledge as to

the specific hours that my clients worked?  That you did not

have any personal knowledge as to the number of hours that the

plaintiffs in this case worked at the Brick Lane Curry House on

a weekly basis?

A.  Because now I do --

          THE COURT:  OK.  So you went and asked this person and

what he told you --

          THE WITNESS:  And the papers that I saw when

submitted.  So it started off with the paperwork.

          THE COURT:  So you had that when you did that

declaration?

          THE WITNESS:  Yes.

          THE COURT:  Go ahead.

BY MR. CLARK:

Q.  Besides the conversations, did you have any knowledge

SATINDER SHARMA                    Sharma - Cross

1    yourself about how many hours my clients worked at Brick Lane

2    Curry House?

3    A.  When they were working there?

4    Q.  Let's start with when they were working there, yes.

5    A.  When they were working there, probably not.

6    Q.  Is that a "no"?

7    A.  Yes.

8    Q.  So you did not have any personal knowledge as to the

9    specific hours my clients worked at the Brick Lane Curry House?

10            MR. VISWANATHAN:  Objection.

11            THE COURT:  Grounds?

12            MR. VISWANATHAN:  After the case started he has

13   personal knowledge.

14            THE COURT:  You can just say the question again.  I

15   think it was clear.  Go ahead.

16   Q.  At the time that my clients were working at Brick Lane

17   Curry House did you have personal knowledge as to their hours

18   on a weekly basis?

19   A.  No.

20   Q.  In paragraph 24 of your affidavit you testified to

21   according to my knowledge and as per my manager/chef any staff

22   hired for a specific purpose was never assigned any duties

23   other than the ones for which the person was hired.  Do you

24   still stand by that statement?

25   A.  Yes.

SATINDER SHARMA                Sharma - Cross

1   Q.  Do you have any personal knowledge as to that statement

2   because you say according to my knowledge and as per my

3   manager/chef, do you have personal knowledge about that

4   statement?

5   A.  I didn't --

6   Q.  Turn it to your deposition page 66 line eight to 23.

7            MR. VISWANATHAN:  Page number, please?

8            MS. GUTIERREZ:  Page 66, eight through 33 and then on

9   67 line 28 through 25 and following on first page, page 68, two

10  through --

11           THE WITNESS:  Could I have the lines again, please?

12  Q.  Two through 17 on 68.

13           MR. VISWANATHAN:  If I may, your Honor?

14           THE COURT:  Go ahead.

15           MR. VISWANATHAN:  I think the -- asked to repeat the

16  page numbers?

17           MS. GUTIERREZ:  66, eight to 23; 67, 18 through 25;

18  line eight through 23, 68, two through 25.

19           THE COURT:  Some of this seems pertinent but not all

20  of it.  If you could just focus a specific question.

21           MS. GUTIERREZ:  Sure.  We could start on 67 then.

22  Going to start reading at page 67 line 18.

23  Q.  OK.  And you mentioned before and I just want to be clear

24  for the record what is back of the housework?

25  A.  Back of the house is anything other than the dining room.

SATINDER SHARMA                Sharma - Cross

Q.  What kind of work is done there?

A.  The kitchen preparing the food.  You know, we get the
deliveries in.  So the stacking of the deliveries, the dishes
go down, cleaning the dishes.  You know when they are working
together somebody is cleaning vegetables.  When the delivery is
ready they pack the deliveries then they go and deliver the
food as well.  There are occasions when the chef even when the
chef will go out and deliver the food if it is not busy.  So
they basically work as a team.  They split it amongst each
other.

Q.  OK?

A.  I let them do whatever they want.  I will put it that way.

Q.  Was then you say they work as a team?  How are you
referring to as "they"?

A.  The chef, the dishwasher, the delivery boys.

BY MS. GUTIERREZ:

Q.  So in fact, Mr. Sharma, sounds like your staff frequently
does work that they weren't hired to do inside the restaurant,
is that correct?

A.  Basically.

Q.  Based on your deposition testimony it sounds like different
staff members do other peoples work if that occasion arises
correct?

A.  The specific, the question that you asked me on that day
was what was the definition of "back of house"?  My reply to

SATINDER SHARMA                Sharma - Cross

1   you was back of house is anything that is not the dining room.

2   You asked me that again the question, what was it at back of

3   the do you do.  Who are the back of the house people?  Anyone

4   who is not working -- back of the house work.  As I said, they

5   work as a team.  And again, I don't micromanage them.  If the

6   chef is cooking food and the delivery boy is standing next to

7   him to send the delivery, they work as a team.  If the chef is

8   cutting meat and getting the -- out and they guys have to take

9   deliveries and I've seen it on certain occasions standing and

10  give me my delivery.  So at that time if he packs the delivery

11  and takes his bag and runs with it that is what I was trying to

12  tell you in terms of teamwork.  Does that clarify my statement?

13  I've been a chef.  You asked me a question back of house.  I

14  have been in kitchens all my life, so this specific answer is

15  pertinent to --

16  Q.  Let's turn to page 66.

17           THE COURT:  You may do that.  Just please don't speak

18  over each other.

19           MS. GUTIERREZ:  Starting at line 8.

20  Q.  How many delivery workers do you have working at the same

21  time?

22  A.  They all split the work actually before it is working.  So

23  they do the delivery.  They even help out.  So I would say

24  about one or two people that do that.  Sometimes I even see

25  three.

SATINDER SHARMA                    Sharma - Cross

1   Q.  When you say they did the deliveries and they also helped

2   out, what kind of work would they do in addition?

3   A.  They're usually the back of the house workers.  I have seen

4   them all hanging out in the kitchen so.

5   BY MS. GUTIERREZ:

6   Q.  My question is, is it your testimony here, Mr. Sharma, in

7   your deposition that when you were referring to the delivery

8   boy doing the back of the house work you explained it in the

9   way you did on page 68 where they also helped out in the

10  kitchen cleaning and doing vegetables; is that correct?

11          MR. VISWANATHAN:  Objection, your Honor.  There is no

12  mention about --

13          THE COURT:  Sustained.

14  BY MS. GUTIERREZ:

15  Q.  If the delivery boys were not doing deliveries they were in

16  the kitchen helping in the kitchen, correct?

17          MR. VISWANATHAN:  Objection, your Honor.

18          THE COURT:  Overruled.

19  Q.  If a delivery worker was not out delivering a delivery

20  would it be fair to say that at the Brick Lane Curry House he

21  could be in the kitchen helping out in the kitchen?

22  A.  Depends on how he -- for example, I have had delivery boys,

23  you know, there's no deliveries as I said in my paper here

24  before, I'm clarifying this.  I don't micromanage them.  They

25  are not -- stock for the rest of the Spanish boys that is

SATINDER SHARMA                Sharma - Cross

1   sitting there eating tacos there.

2   Q.  Let's go to page 99, line 17 through 25.

3           THE COURT:  Go ahead.

4           MS. GUTIERREZ:  Page 99 line 17 starts.

5   Q.  Based on your observation of her, what were her duties?

6   A.  I have seen her, you know, dish-washing.  I mean working in

7   the kitchen.  We would use the very general term "dish

8   washing".

9           Now based on that testimony, is it still you testimony

10  today that people who were hired at Brick Lane Curry House to

11  do one job only did that one job?

12  A.  Yes.  Can I say something extra?

13          MR. VISWANATHAN:  That's enough.

14          THE COURT:  Go ahead.

15  A.  As I have said in the past, when it comes to Eufemia

16  especially she was a dishwasher.  She was free.  And the fact

17  is the reason why I even got the manager here to sit down was

18  because he was the one who was pleading to kept her to work.

19  He was the one who often, OK, walk two blocks.  Give us a

20  delivery.  Help us out.  Anything like that.  Just to clarify

21  that, she was physically incapable of doing what she was

22  supposed to do.

23          THE COURT:  Is that -- referred to in the transcript?

24          THE WITNESS:  Yes.

25          THE COURT:  All right.

SATINDER SHARMA                    Sharma - Cross

1              MS. GUTIERREZ:  I would just like to strike whatever

2      was nonresponsive to the question that I asked about the

3      capabilities of my client.

4              THE COURT:  I would take it only for what it's worth

5      to the extent it was responsive to what you're after which is

6      whether or not it's true or not that people are assigned other

7      duties than the ones for which they're hired for to the extent

8      it's responsive to that.

9              MS. GUTIERREZ:  Thank you.

10     Q.  In paragraph 18 of your declaration you state that, I have

11     never hired or fired an employee at Brick Lane Curry House.

12     Below that at page 19, paragraph 19, I have never been

13     personally involved in preparing the work schedule of the

14     employees at the restaurant.  In these paragraphs that he

15     referred to that staff that's working at the restaurant as

16     employees; is that correct?

17     A.  Yes.

18     Q.  Is it fair to say that the staff in the kitchen and the

19     delivery workers were employees at Brick Lane Curry House?

20     A.  At the time, yes.

21     Q.  So is it fair to say that the plaintiffs in this matter

22     during the time they worked at Brick Lane Curry House were

23     employees at Brick Lane Curry House?

24             MR. VISWANATHAN:  Objection, your Honor.  This goes to

25     the leading.

SATINDER SHARMA                    Sharma - Cross

1          THE COURT:  Sustained.

2  Q.  Paragraph 22.  I think you testified that a notice was

3  posted in the work area regarding wage an hour laws due to --

4  employees; that's your testimony correct?

5  A.  Yes, that's correct.

6  Q.  You never personally ave my clients any personal notice,

7  correct?

8  A.  I was not in the day-to-day operation of hiring but I do

9  know of the notices because I personally make sure each one of

10  my restaurants have them.

11  Q.  You are talking about the sign?

12  A.  I beg your pardon.

13  Q.  The sign?

14  A.  Yeah, they're printouts as well as big posters, the whole

15  thing.

16  Q.  OK.  But you personally did not give any type of written

17  paper about wages to plaintiffs in the action?

18  A.  No, I didn't.

19          MS. GUTIERREZ:  Almost done.

20          THE COURT:  OK.

21          MS. GUTIERREZ:  Nothing further, your Honor.

22          THE COURT:  All right.  Thank you.  You have redirect,

23  counsel?

24          MR. VISWANATHAN:  Couple questions.

25          THE COURT:  You're permitted to do redirect.  My

SATINDER SHARMA                Sharma - Cross

1    question was just do you have any?

2                    MR. VISWANATHAN:  Yes.

3                    THE COURT:  All right.  Thank you.  Because I want to

4    take a break and so if you didn't have redirect then I wouldn't

5    break yet but if you do I'll break now.  So we'll take a

6    ten-minute break.  Mr. Sharma remains under oath.  So, of

7    course, no substantive -- with the witness while we just take a

8    break for ten minutes.  OK?  Everybody agree with those ground

9    rules?

10                   (Recess)

11                   THE COURT:  Mr. Sharma, I remind you that you are

12   under oath.

13                   You may proceed with your examination, counsel,

14   needless to say within scope of the cross-examination.

15                   MR. VISWANATHAN:  Thank you, your Honor.

16   BY MR. VISWANATHAN:

17   Q.  Do you personally know her that she was the --

18                   THE COURT:  Are you asking Ms. Castillo, Ms. Eufemia

19   Castillo?  And the question is do you personally know her?

20   A.  I know of her because that was the only lady who worked.

21   That's about it.

22   Q.  When you first saw her, what was your immediate reaction?

23                   MS. GUTIERREZ:  Objection.

24                   THE COURT:  Sustained.  If you want to rephrase,

25   counsel, in a way that makes that question understandable, you

SATINDER SHARMA               Sharma - Cross

1    may do so.

2    Q.  You testified that she made the deliveries.  Can you

3    explain why she was asked to do deliveries.

4    A.  Again, I'm not sure how to -- again, I don't understand the

5    question.  You'll have to rephrase it for me.

6    Q.  On page 99 of the deposition lines 19 to 21.

7              MS. GUTIERREZ:  Objection.

8              THE COURT:  Sustained.

9    Q.  Page 36 of the deposition --

10             THE COURT:  Sustained.  Maybe I'm missing what you're

11   doing.  The deposition was permissibly referred to earlier to

12   the extent that counsel was seeking to impeach that prior

13   inconsistent statement.

14             MR. VISWANATHAN:  I understand.  I'm sorry for that.

15   I understand, your Honor.

16             THE COURT:  So I'm not sure what you're trying to do

17   but just ask a question and then if there is some permissible

18   way for you to refer to the deposition, we can do that.  I

19   don't know what it would be but if you could just ask the

20   question.  Thank you.

21   Q.  With regard to Vivek Deora or as he was called the DJ was,

22   he working with your restaurant before?

23   A.  Yes, that's correct.

24   Q.  So there was no fresh appointment or new appointment made,

25   correct?

SATINDER SHARMA                    Sharma - Cross

1    A.  Correct.

2    Q.  All along there was the reference to "Warner", the

3    difference BLCH Third Avenue as a legal corporation, there

4    cannot be any Warner.  When you referred to Warner what exactly

5    you were --

6              MS. GUTIERREZ:  Objection.

7              THE COURT:  I don't understand the question, counsel.

8    So I will sustain the objection.

9    Q.  With regard to allegations BLCH Third Avenue, what is your

10   actual relation?

11   A.  I believe the technical term would be "shareholder" or

12   "member".  Is that what you're trying to ask me?

13   Q.  Yes.

14             THE COURT:  You are?

15             THE WITNESS:  Yes.

16             THE COURT:  Any shareholder owner?

17             THE WITNESS:  Bluestone, he is probably trying to ask

18   me you are one of the owners.  But in a corporation in

19   technical jargon it's probably called you're a member or a

20   shareholder of a corporation, an LLC.  That's probably what he

21   is trying to ask me.

22   Q.  Mr. Vivek was with the Brick Lane Curry House even before

23   you joined?

24             MS. GUTIERREZ:  Objection.

25   A.  No.

SATINDER SHARMA                    Sharma - Cross

1           THE COURT:  Overruled.

2    Q.  You can state that --

3           THE COURT:  He said "no".

4           MR. VISWANATHAN:  I have no further questions, your

5    Honor.  Thank you very much.

6           THE COURT:  All right.  Anything?

7           MS. GUTIERREZ:  Nothing, your Honor.

8           THE COURT:  All right.  Thank you.  You may step down.

9           Mr. Viswanathan, anything further?

10          MR. VISWANATHAN:  Nothing.

11          THE COURT:  All right.  Counsel.

12          MS. GUTIERREZ:  Nothing further, your Honor.  Thank

13   you.

14          THE COURT:  All right.  So let us then, I think I had

15   asked you to see if you could come to an agreement on a

16   schedule for submission of a proposed findings of fact based on

17   the trial record and the memorandum and conclusion of law

18   laying out the law you deem applicable and the application of

19   the trial record.  Did you do so?

20          MS. GUTIERREZ:  Yes.  We had a conversation this

21   morning.  If your Honor would extend 45 days to us to get that

22   in, so we have two weeks to receive the transcript and some

23   time to work on it.  We can probably do it in 30 days if we

24   order the transcript right away.

25          THE COURT:  All right.  And what would be the proposal

SATINDER SHARMA                    Sharma - Cross

1   for submissions, in other words, simultaneous standard, when

2   would it be fully briefed?

3           MS. GUTIERREZ:  I was thinking simultaneous.  That's

4   what we were talking about.

5           THE COURT:  Agreed, Mr. Viswanathan?

6           MR. VISWANATHAN:  Yes.

7           THE COURT:  All right.  Well, let's do 30 days.

8           MS. GUTIERREZ:  OK.

9           THE COURT:  And I think it would a benefit to the

10  Court if something like a week after you each submit you're

11  given an opportunity to rebut each other's papers briefly as

12  well.  OK?  So here is what I'd like.  I'd like first a

13  document that is essentially just a proposed findings of fact.

14  And again, this is just facts and everything included in that

15  will have a citation to the trial record.  I don't think you

16  need more than 20 pages for that.

17          Let me tell you what else I'm thinking and then you

18  can tell me what you think.  And then a separate document

19  which, essentially, your memorandum of law that will layout the

20  law that you think applies and then applies the facts of the

21  case to the law.  In other words, this is what you would write

22  if you were writing an opinion in the case, right?  And any

23  facts referenced in this document must be contained in the

24  separate paragraph by paragraph statement of proposed findings

25  of fact.

SATINDER SHARMA                Sharma - Cross

1          So you've got your document that's your proposed

2     findings of fact.  One fact by fact with trial record citation

3     and then a separate document that lays out the legal standard

4     and makes and applies the facts to the law.  And again, any

5     facts relied on in that document are contained in a separate

6     findings of fact document.

7          The reason for that is so that in your response papers

8     if anyone objects to any of the facts contained in the other

9     side's proposed findings of fact, you could say that you object

10    to that fact or you contest that fact and here is your counter

11    record cite or you can note the absence of record citation by

12    the other side.  And that way I know exactly what facts you

13    have in context and your citation to the record for each

14    document.  It's kind of like a 56.1 statement in the summary

15    judgment context but relying on the trial record.

16         So those are the two documents I have in mind.  And I

17    would propose 20 pages limit on the proposed findings of fact.

18    Let's say 25 pages for the memorandum of law that applies facts

19    to the law as you -- everyone agree with that basic approach?

20         MS. GUTIERREZ:  Yes, your Honor.

21         MR. VISWANATHAN:  Yes, your Honor.

22         THE COURT:  And then a week after that you can each

23    submit your rebuttal to the other's submissions.  And again, if

24    you take the proposed findings, you take what the other side

25    submitted as to proposed findings.  And to the extent that you

SATINDER SHARMA                    Sharma - Cross

1   agree with the facts they've asserted you indicate that and you

2   provide your record citation for a contrary proposition or you

3   state that they failed to cite the record for the fact that

4   they're proposing.

5           And then for the memorandum of law I'll give you about

6   ten pages -- let's say ten pages each -- to rebut the

7   memorandum of law that was submitted by each side.  Does that

8   make sense?

9           MS. GUTIERREZ:  Yes, your Honor.

10          THE COURT:  I think that would be what is most helpful

11  to the Court.

12          Mr. Viswanathan, any questions or concerns?

13          MR. VISWANATHAN:  What would be the -- for the

14  proposed findings of fact motion?

15          THE COURT:  So the original one that you are

16  submitting simultaneously, you each have 20 pages.

17          MR. VISWANATHAN:  Then within a week or we each have

18  time to submit --

19          THE COURT:  For the findings of fact what I would ask

20  you to do is just to take each paragraph that your opponent

21  submitted and say, no disagreement but here, object to this

22  fact that's stated in your opponent's side and specify the

23  bases in the record for your opposition to the stated factual

24  finding.

25          MR. VISWANATHAN:  That would be one week after?

SATINDER SHARMA                    Sharma - Cross

1        THE COURT:  Right.

2        MR. VISWANATHAN:  And --

3        THE COURT:  No.  It will just parallel what your

4   opponent submitted.

5        MR. VISWANATHAN:  So even if there was --

6        THE COURT:  So if paragraph one of the proposed

7   findings of fact is Ms. Castillo performed deliveries for the

8   restaurant on these dates, something like that, if you don't

9   disagree with that you say "no disagreement".  If you do

10   disagree with it you state what your basis is in the record for

11   disagreement or indicate that they've failed to justify the

12   factual finding in the record.  OK?

13        MR. VISWANATHAN:  Yes.

14        THE COURT:  I'm just trying to devise what I think

15   would be under the circumstances of this case most useful for

16   the Court.  And as I say if anyone has any different

17   suggestions or concerns I'm happy to do this.

18        MS. GUTIERREZ:  So the proposed findings of fact, 20

19   page maximum and then the memorandum of law, 25 page maximum.

20        THE COURT:  How does that sound?

21        MS. GUTIERREZ:  That's fine.

22        THE COURT:  That's my proposal unless anyone has a

23   different request.

24        MR. VISWANATHAN:  That's fine.

25        THE COURT:  And then on rebuttal you are not limited

SATINDER SHARMA                Sharma - Cross

1   in your pages for the rebuttal to the factual findings cause

2   that's just going to parallel what your opponent submitted.

3   And then on the rebuttal, on my proposal for rebuttal of

4   memorandum of law is to limit you to ten pages.  OK?

5              MR. VISWANATHAN:  Yes.

6              THE COURT:  All right.  And so the simultaneous

7   submission of the original documents is due 30 days from today.

8   Today is April 18th, so May 18th.

9              MR. VISWANATHAN:  Your Honor, I have a trial in

10  another county around May 18.

11             THE COURT:  OK.  How about May 25th?

12             MR. VISWANATHAN:  Yes.  Thank you.

13             THE COURT:  All right.  May 25th, and then rebuttal

14  documents a week later on June 1.  OK?

15             MR. VISWANATHAN:  Yes.

16             THE COURT:  All right.  Any questions again about the

17  procedure, any questions?

18             MR. VISWANATHAN:  And the memorandum of law, judge?

19             MS. GUTIERREZ:  June 1 is just over Memorial Day

20  weekend and I just ask for a few extra days.

21             THE COURT:  All right.  Why don't we make it two

22  weeks.

23             MS. GUTIERREZ:  All right.  Thank you.

24             THE COURT:  So the rebuttal papers would be June 8.

25  I'm extending two dates.  When both sides file their original

SATINDER SHARMA                Sharma – Cross

1  proposed findings and memorandum of law and then the rebuttal

2  documents due two weeks later.  OK?  Any questions or concerns?

3          MS. GUTIERREZ:  That's it, your Honor.  Thank you.

4          MR. VISWANATHAN:  Can the defendants –– to the

5  deposition, is it possible?

6          THE COURT:  Whatever was admitted at trial.  So you

7  have the declarations and exhibits and the trial testimony.

8  That's the trial record, counsel.

9          MR. VISWANATHAN:  All right.

10          THE COURT:  Anything else?

11          MR. VISWANATHAN:  Nothing.

12          MS. GUTIERREZ:  Nothing.

13          THE COURT:  All right.  Now nothing further, we are

14  adjourned.

15                     (Adjourned)

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                            Page
 3   VALENTIN TAPIA
 4   Direct Mr. Clark . . . . . . . . . . . . . . . 7
 5   Cross Mr. Viswanathan  . . . . . . . . . . . .11
 6   EUFEMIA CASTILLO
 7   Direct By Ms. Gutierrez  . . . . . . . . . . .50
 8   Cross By Mr. Viswanathan . 52 by Mr. Viswanathan )
 9   ROMULO RICANO BALDERAS
10   Direct By Ms. Gutierrez  . . . . . . . . . . .70
11   Cross By Mr. Viswanathan . . . . . . . . . . .73
12   SATINDER SHARMA
13   Direct Mr. Viswanathan . . . . . . . . . . . .87
14   Cross By Ms. Gutierrez . . . . . . . . . . . 100
15                      PLAINTIFF EXHIBITS
16   Exhibit No.                            Received
17    TWO   . . . . . . . . . . . . . . . . . . .10
18    Three   . . . . . . . . . . . . . . . . . .51
19    5   . . . . . . . . . . . . . . . . . . . .72
20    6   . . . . . . . . . . . . . . . . . . . .72
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300